WAKE CARES, INC., PATRICE LEE, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF HER MINOR CHILDREN, IAN LEE, DELANEY LEE, MARGARET LEE AND BAILEY LEE; KATHLEEN BRENNAN, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF HER MINOR CHILD, ELIZABETH BRENNAN; SCOTT P. HAVILAND AND GIHAN I. EL-HABBAL, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, AHMED HAVILAND, AYAH HAVILAND AND IMAN HAVILAND; MICHAEL JOHN STANTON AND ANGELA MARIE STANTON, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, JACOB STANTON, ALEXIS STANTON, DANIELLE STANTON, DALLAS STANTON AND JORDAN STANTON; AND KIMBERLY SINNOTT AND JOHN NADASKY, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, REID NADASKY, SEAN NADASKY, AND JAMES NADASKY, ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED, PLAINTIFFS v. WAKE COUNTY BOARD OF EDUCATION AND LORI MILBERG, HORACE J. TART, CAROL PARKER, ROSA GILL, SUSAN PARRY, PATTIE HEAD, ELEANOR GOETTEE, RON MARGIOTTA, AND BEVERLEY CLARK, IN THEIR OFFICIAL CAPACITY AS MEMBERS OF THE WAKE COUNTY BOARD OF EDUCATION, DEFENDANTS

No. COA07-810

(Filed 6 May 2008)

## 1. Associations; Schools and Education— standing—non-profit organization—associational basis inapplicable

Wake Cares, Inc., a nonprofit organization, did not have associational standing to bring a declaratory judgment action challenging a county board of education's plan to convert traditional calendar schools to year-round schools and then to assign students to those schools on a mandatory basis because the organization has no members and could not seek relief "on behalf of its members." Furthermore, the organization could not rely on

1

WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.

[190 N.C. App. 1 (2008)]

the constituency theory of *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333 (1977), to establish standing where it made no attempt to show that it meets the constituency test of that case.

**2. Declaratory Judgments; Schools and Education— standing—challenge to mandatory year-round schools—parents of students**

The individual plaintiffs, parents of public school students, have standing to bring a declaratory judgment action individually and as guardians ad litem of their children challenging a county board of education's plan to assign students to year-round schools on a mandatory basis because the individual plaintiffs were directly affected by the board's action where each of the students was initially assigned to a year-round school, and even though some of the students were ultimately reassigned to traditional calendar schools, they may still be assigned to year-round schools in the future.

**3. Declaratory Judgment; Schools and Education— subject matter jurisdiction—exhaustion of administrative remedies**

The trial court did not err by denying the board of education's motion to dismiss plaintiffs' complaint for a declaratory judgment based on an alleged failure to exhaust administrative remedies because: (1) N.C.G.S. § 115C-369 provides no means for determining whether a plan for mandatory year-round schools is statutorily or constitutionally permitted; (2) the statute focuses on the individual assignment of a student and would not supply the relief sought in plaintiffs' complaint regarding the board's plan and regulations; and (3) the board has not pointed to any other statute that would provide an administrative remedy encompassing that sought by plaintiffs.

**4. Appeal and Error— appealability—mootness**

The trial court did not err in a declaratory judgment action by concluding that plaintiffs' challenge to defendant board of education's plan to assign public school students to year-round schools on a mandatory basis was not rendered moot even though all the plaintiffs who were initially assigned to a year-round school under its 2007-2008 assignment plan and subsequently applied for transfer had been reassigned to a traditional calendar or magnet

school because plaintiffs' individual reassignments do not termi-
nate the uncertainty and controversy giving rise to this action as
would a declaration that the board does or does not have the
authority to implement the plan.

**5. Appeal and Error— preservation of issues—failure to argue at trial—failure to cross-assign error**

Although plaintiffs contend the trial court's order in a decla-
ratory judgment action should be affirmed based on the rhetoric
of constitutional rights, this argument is not properly before the
appellate court because: (1) the trial court based its decision
solely on the board of education's lack of statutory authority and
its conclusion that mandatory year round schools are not author-
ized under the law; and (2) plaintiffs did not cross-assign error on
the grounds that those constitutional arguments present alterna-
tive bases for upholding the trial court's decision.

**6. Schools and Education— board of education's authority— operation of year-round schools**

Local boards of education have the authority to create and
operate year-round schools because: (1) in the scheme of public
education adopted by the General Assembly, the general control
and supervision of all matters pertaining to the public schools in
their respective administrative units is delegated to the county
and city boards of education subject to any paramount powers
vested by law in the State Board of Education or any other
authorized agency; (2) the General Assembly has also set out a
list of specific powers and duties vested in local school boards
under N.C.G.S. § 115C-47 including granting local school boards
broad authority to set the school calendar in accordance with
N.C.G.S. § 115C-84.2, which in turn encourages local school
boards to consider calendar flexibility as a means of achieving
educational standards; and (3) the express language exempting
year-round schools from the calendar-design restrictions demon-
strated that the General Assembly recognized a year-round calen-
dar as a valid alternative to the traditional calendar.

**7. Schools and Education— assignment of students to year—round schools—informed parental consent not required**

The trial court erred by concluding the local board of
education may not assign students to year-round schools with-
out informed parental consent because: (1) the conclusion is
precluded by N.C.G.S. § 115C-366(b); (2) the only restrictions

placed on a board's assignment authority are set forth in N.C.G.S. § 115C-367 which prohibits local school boards from assigning students to a given school on account of race, creed, color or national origin; (3) the board has the authority to operate schools in the county school system on a year-round calendar, and thus N.C.G.S. § 115C-366(b) grants full and complete authority to the board to assign children to such schools; (4) there was no contention that plaintiffs are being denied equal access to a sound basic education by being assigned to year-round calendar schools, and thus, N.C.G.S. § 115C-1 does not provide plaintiffs with a right to equal opportunity to attend a school with a traditional calendar; (5) N.C.G.S. § 115C-84.2 does specifically exempt year-round schools from the statute's requirement regarding opening and closing dates of school calendars, and the apparent protection of a teacher's summer vacation; (6) the language of N.C.G.S. § 115C-84.2 is clear, and thus legislative history cannot be relied upon to force a construction on that statute inconsistent with the plain language; (7) the trial court's and plaintiffs' legislative history analysis overlooks the General Assembly's adoption in 1997 of the exemption for year-round schools in the calendar limitation regarding teacher vacation days; (8) neither the trial court nor plaintiffs have presented any other statutory basis for a requirement of informed parental consent prior to assignment of a child to a year-round school; (9) a duty to consult under N.C.G.S. § 115C-84.2(a) cannot be changed to impose a duty to obtain consent; and (10) under N.C.G.S. § 115C-366(b), when a local school board exercises its full and complete authority to assign a student to a year-round school, that decision is final subject only to an application by the student under N.C.G.S. § 115C-369 for reassignment.

Appeal by defendant from order entered 3 May 2007 by Judge Howard E. Manning, Jr. in Wake County Superior Court. Heard in the Court of Appeals 9 January 2008.

*Hunter, Higgins, Miles, Elam & Benjamin, PLLC, by Robert N. Hunter, Jr.; and William Peaslee, for plaintiffs-appellees.*

*Tharrington Smith, L.L.P., by Ann L. Majestic and Curtis H. Allen III, for defendants-appellants.*

*Kelly & Rowe, P.A., by Robert F. Orr, for amicus curiae North Carolina Association of School Administrators.*

*Roberts & Stevens, P.A., by Christopher Z. Campbell and K. Dean Shatley, II, for amicus curiae North Carolina Council of School Attorneys.*

*Poyner & Spruill, LLP, by Edwin M. Speas, Jr.; and Allison Schafer for amicus curiae North Carolina School Boards Association.*

*UNC Center for Civil Rights, by Ashley Osment, for amici curiae The Wake County Voters Education Coalition, Eugene Weeks, Jennifer A. Bowden, Gerald Wright, Calla Wright, Erica Edwards, Quanta Edwards and Denise Winters.*

GEER, Judge.

Defendant Wake County Board of Education ("the Board") appeals from the trial court's order concluding that the Board "lacks the statutory authority to convert traditional calendar schools to *mandatory* year round schools," but ruling that the Board "is authorized by law to operate, *on a voluntary consensual basis,* year round calendar schools," so long as it obtains "*informed parental consent.*"[1] (Emphasis original.) Based, however, upon our review of the controlling statutes, we hold that the Board is authorized by the General Assembly to establish year-round schools and to assign students to attend those schools without obtaining their parents' prior consent. We, therefore, reverse the decision below.

## Facts

The facts in this case are essentially undisputed.[2] The Wake County Public School System ("WCPSS" or "the school system") is one of the fastest growing public school systems in the nation. In recent years, its student population has increased more than 30 percent from 98,000 students in 2000 to over 128,000 students in school year 2006-2007. The Wake County Planning Department estimated that the school system would add another 8,000 students in the 2007-2008 school year and an additional 65,000 students by 2015. Since July 2000, the Board has opened more than 33 new schools and renovated others to deal with the burgeoning student population.

1. The trial court dismissed plaintiffs' claims against the individual school board members asserted against them only in their official capacity as members of the Board on the ground that those claims were redundant. Plaintiffs have not appealed that dismissal. Therefore, the only remaining defendant is the Board.

2. The facts set forth in this opinion were recited by the trial court. The parties have not contested these facts on appeal.

WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.

[190 N.C. App. 1 (2008)]

The Board's building plan has not, however, been able to keep pace with the influx of students. Many schools are overcrowded and use cafeterias, libraries, auditoriums, offices, common areas, teacher lounges, and converted storage rooms as classrooms. In addition, there are more than 1,100 mobile classrooms being used, as compared to 584 mobile units used in the 2002-2003 school year. The 1,100 mobile classrooms seat 25,300 students. Almost one fourth of WCPSS elementary school students are educated in mobile classrooms, a situation that overtaxes facilities such as restrooms, media centers, and cafeterias. At several WCPSS elementary schools, the first lunch period begins as early as 10:30 a.m., while other students end their lunch period just before going home for the day.

Beginning in late 2005, the Board worked with the Wake County Board of County Commissioners and county staff to develop a long-term construction plan that would address the school system's increasing facility needs. The overall plan included five different alternatives, each varying in cost based on the level of construction. All five scenarios contemplated converting some existing schools to a year-round calendar and building new schools that would also operate on a year-round calendar. In developing this plan, the Board considered information from school staff, the results of community surveys, input from county commissioners, and communications from parents, teachers, and community members. It was apparent that a majority of the community would not support a school bond for construction and renovation of schools that exceeded $1 billion.

Presently, the WCPSS has approximately 147 public schools. The schools have three different calendars: a traditional calendar, a multi-track year-round calendar, or a modified calendar (a single-track year-round calendar). All calendars have a total of 180 school days. The traditional calendar begins school in late August and continues until a summer vacation in early June. The modified calendar begins in late July and ends in late May. In the multi-track year-round schools, students are divided into four tracks, each with its own class schedule. Track schedules are then staggered so that three tracks are in school and one track is on break at all times. With the multi-track year-round calendar, 1,000 students can be assigned to a school that would have a traditional-calendar capacity of only 750 students.

As of the 2006-2007 school year, WCPSS operated 16 year-round elementary schools and four year-round middle schools. In that school year, 91,426 students were enrolled in WCPSS elementary and middle schools with 17,174 attending year-round schools. Although

most of the year-round schools were considered "voluntary," and students had to apply to attend them, each year-round school has had a portion of students involuntarily assigned to it since 2003. For the 2006-2007 school year, there were 6,929 students involuntarily assigned to a year-round school. In addition to the multi-track year-round schools, WCPSS operates six magnet schools on the single-track year-round calendar. For the 2006-2007 school year, there were 1,320 students involuntarily assigned to magnet schools.

In September 2006, the Board voted to convert 19 elementary and 3 middle schools to a year-round calendar starting in the 2007-2008 school year, adding approximately 5,000 seats. In making this decision, the Board weighed the risk of a failed bond referendum against a preference for more expensive traditional calendar schools. On 7 November 2006, Wake County voters approved a $970 million bond to fund the Board's capital improvement plan. Beginning on 8 December 2006, the Board began considering proposals for student assignments for the 2007-2008 school year based on its capital improvement plan.

Prior to approving a final assignment plan, the Board notified the parents of potentially affected students that their child could be assigned to a mandatory year-round school and gave them the opportunity to select which "track" they preferred for their child's schedule. On 6 February 2007, after holding three public hearings, the Board approved its final student assignment plan for the 2007-2008 school year. Under that plan, 20,717 students were assigned to newly-converted or newly-built year-round schools. 17,855 of those students had previously been assigned to traditional calendar schools.

On 13 March 2007, plaintiffs filed a class action lawsuit in Wake County Superior Court challenging the Board's plan. The plaintiffs include Wake Cares, Inc., a non-profit organization, and eight parents of WCPSS students, individually and as guardians ad litem for their children. No class was certified prior to the trial court's final order. In their complaint, plaintiffs asserted that the Board lacked the constitutional and statutory authority to convert traditional calendar schools to year-round schools and then assign WCPSS students to those schools on a mandatory basis. Plaintiffs further claimed that the Board's plan to establish mandatory year-round schools for some students while maintaining traditional calendar schools for other students violated plaintiffs' federal due process and equal protection rights; violated plaintiffs' fundamental right to a "uniform and regular education on equal terms" as protected by the North Carolina

Constitution and Chapter 115C of the General Statutes; and violated plaintiffs' right to procedural due process. Plaintiffs sought a declaratory judgment as well as an injunction prohibiting the Board from implementing its plan.

On 4 April 2007, the Board moved to dismiss plaintiffs' claims pursuant to Rule 12(b)(1) and (6) of the Rules of Civil Procedure based on a lack of standing, failure to exhaust available administrative remedies, mootness, and failure to state a claim for relief. Because the trial court chose to consider affidavits submitted by the Board in opposition to plaintiffs' motion for a preliminary injunction, the court converted the Board's Rule 12(b)(6) motion to dismiss into a motion for summary judgment under Rule 56.

After rejecting the Board's arguments regarding standing, exhaustion of administrative remedies, and mootness, the trial court concluded that "the Wake County Board of Education is authorized by law to operate, *on a voluntary consensual basis*, year round calendar schools, modified year round calendar schools, and magnet schools operating as modified or year round calendar schools." According to the trial court, however, the Board "lacks the legal authority from the General Assembly to force children to attend mandatory year round schools." Specifically, the court concluded "[t]hat the Wake County Board of Education *may not require* the attendance of students at year round calendar schools *without informed parental consent*." (Emphasis original.) Finally, the court asserted: "Having made the legal determination that mandatory year round schools are not authorized under the law, there is no need to go further." The court, therefore, entered summary judgment in favor of plaintiffs, but left for the Board "[t]he nuts and bolts of obtaining informed parental consent, determining how many Wake County students and families are willing *to accept assignment* to the newly converted and formerly mandatory year round *assignments*[,] and the aftermath of such determinations . . . ." (Emphasis added.)

The Board timely appealed to this Court. Plaintiffs did not cross-assign error to any portion of the trial court's order. On 25 July 2007, however, plaintiffs filed with the Supreme Court a petition for by-pass of the Court of Appeals pursuant to N.C. Gen. Stat. § 7A-31 (2007) and N.C.R. App. P. 15. That petition was denied on 8 November 2007.

I

We first address the jurisdictional issues raised by the Board. The Board claims that the trial court should have dismissed plaintiffs'

complaint based on (1) lack of standing, (2) a failure to exhaust administrative remedies, and (3) mootness. While we agree that Wake Cares lacks standing, and the motion to dismiss should have been granted as to that organization, we hold that the trial court properly denied the motion as to the Board's remaining arguments.

A. Standing

[1] With respect to Wake Cares' standing, the trial court stated: "Wake Cares, Inc., a non-profit organization, has standing to assert the claims which its members and constituents might have asserted." It is undisputed that Wake Cares in fact has no "members." The Board contends that controlling authority, which does not address "constituents," requires dismissal of Wake Cares as a plaintiff.

An association may have standing to sue " 'in its own right to seek judicial relief from injury to itself,' " *River Birch Assoc. v. City of Raleigh*, 326 N.C. 100, 129, 388 S.E.2d 538, 555 (1990) (quoting *Warth v. Seldin*, 422 U.S. 490, 511, 45 L. Ed. 2d 343, 362, 95 S. Ct. 2197, 2211-12 (1975)), or may assert associational standing to seek relief "on behalf of its members." *Id.* at 130, 388 S.E.2d at 555. With respect to associational standing, our Supreme Court has held:

> "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."

*Id.* (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 53 L. Ed. 2d 383, 394, 97 S. Ct. 2434, 2441 (1977)).

In this case, the trial court did not base its conclusion that Wake Cares had standing on any injury to Wake Cares itself, but instead relied solely upon associational standing. Yet, it is undisputed that Wake Cares has no members and, thus, it could not be seeking relief "on behalf of its members." *Id.*

Nevertheless, the United States Supreme Court in *Hunt* recognized a form of associational standing that would permit an organization "to assert the claims of its constituents." 432 U.S. at 345, 53 L. Ed. 2d at 395, 97 S. Ct. at 2442. In *Hunt*, the Washington State Apple Advertising Commission, a state agency, did not have "members," but the Court concluded that it still had standing to "assert[] the claims of

the Washington apple growers and dealers who form its constituency," *id.* at 344, 53 L. Ed. 2d at 395, 97 S. Ct. at 2442, because these growers and dealers "possess[ed] all of the indicia of membership in an organization." *Id.*

Neither the parties nor the trial court specifically address *Hunt's* constituency basis for standing, which has also not been previously addressed by North Carolina's appellate courts. *See Goldston v. State*, 361 N.C. 26, 35, 637 S.E.2d 876, 882 (2006) ("While federal standing doctrine can be instructive as to general principles . . . and for comparative analysis, the nuts and bolts of North Carolina standing doctrine are not coincident with federal standing doctrine.").

We need not, however, decide whether North Carolina should adopt *Hunt's* constituency basis for standing because even assuming, without deciding, that *Hunt's* test should apply to a private organization like Wake Cares, Wake Cares has made no attempt to show that it meets that test. *See, e.g., In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 196 (2d Cir. 2000) ("In evaluating the Commission's claim of standing, the *Hunt* Court listed a number of ways in which the Commission functioned effectively as a membership organization."); *Washington Legal Found. v. Leavitt*, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (setting forth test that must be met for organization to be deemed "functional equivalen[t]" of traditional membership organizations). Since Wake Cares has not demonstrated that it would qualify as an organization entitled to represent its constituents, it cannot rely on that theory as a basis for establishing standing, and its claims must be dismissed. *See Holocaust Victim Assets Litig.*, 225 F.3d at 196 (dismissing appeal of organization for lack of standing because organization "ha[d] not provided any information that would indicate whether it meets these requirements" of *Hunt*).

Although plaintiffs propose additional theories of standing for Wake Cares, the trial court did not address any theory other than associational standing, and plaintiffs have not cross-assigned error to the court's failure to find standing on those bases. Consequently, those contentions are not properly before this Court. *See Harllee v. Harllee*, 151 N.C. App. 40, 51, 565 S.E.2d 678, 685 (2002) ("[P]laintiff failed to cross-assign error pursuant to Rule 10(d) to the trial court's failure to render judgment on these alternative grounds. Therefore, plaintiff has not properly preserved for appellate review these alternative grounds."). We, therefore, hold that the trial court erred in not granting the Board's motion to dismiss Wake Cares' claims for lack of standing.

[2] The Board also argues that the individual plaintiffs lack standing to sue, contending that none of the plaintiffs have taxpayer standing and that five of the children and three of the parents cannot establish an injury in fact. The trial court did not specifically analyze whether the individual plaintiffs had standing, stating only: "The Court has considered all other arguments in relation to the [Board]'s motion to dismiss pursuant to Rule 12(b)(1) for lack of jurisdiction and standing and rejects those arguments without further discussion." We hold that the individual plaintiffs have sufficiently established their standing to bring a declaratory judgment action.

In pertinent part, the Declaratory Judgment Act provides:

Any person . . . whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise, and obtain a declaration of rights, status, or other legal relations thereunder.

N.C. Gen. Stat. § 1-254 (2007). Thus, "[t]he Declaratory Judgment Act permits any person affected by a statute or municipal ordinance to obtain a declaration of his rights thereunder." *Bland v. City of Wilmington*, 278 N.C. 657, 659, 180 S.E.2d 813, 815 (1971).

Our Supreme Court has further specified that "[a]n action may not be maintained under the Declaratory Judgment Act to determine rights, status, or other relations unless the action involves a present actual controversy between the parties." *Town of Emerald Isle v. State*, 320 N.C. 640, 645-46, 360 S.E.2d 756, 760 (1987). "A declaratory judgment may be used to determine the construction and validity of a statute," *id.* at 646, 360 S.E.2d at 760, but the plaintiff must be "directly and adversely affected" by the statute, *id.* Most recently, our Supreme Court has explained that a declaratory judgment should issue " '(1) when [it] will serve a useful purpose in clarifying and settling the legal relations at issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceeding.' " *Goldston*, 361 N.C. at 33, 637 S.E.2d at 881 (quoting *Augur v. Augur*, 356 N.C. 582, 588, 573 S.E.2d 125, 130 (2002)).

In this case, the individual plaintiffs challenge the Board's authority to require students to attend year-round schools. Each of the students involved in this action was initially assigned to a year-round

school. The individual plaintiffs were, therefore, directly affected by the action of the Board. While some of the students were ultimately re-assigned to attend traditional calendar schools for the calendar year 2007-2008, they may still be assigned to year-round schools in the future. As a result, an actual controversy still exists, and a declaratory judgment as to the authority of the Board and the rights of the parents and students would terminate and afford relief from the uncertainty, insecurity, and controversy currently existing. *See Charlotte-Mecklenburg Hosp. Auth. v. N.C. Indus. Comm'n*, 336 N.C. 200, 214, 443 S.E.2d 716, 725 (1994) (plaintiffs could seek declaratory judgment that Industrial Commission's rule limiting amounts paid hospital was unlawful even though rule allowed plaintiffs to seek exception from rule because plaintiffs were "not required to sustain actual losses in order to make a test case"). Accordingly, the individual plaintiffs have standing to seek a declaratory judgment.

Because of our disposition of this appeal, we need not address whether plaintiffs have standing to seek injunctive relief. We also are not required to address whether the individual plaintiffs have taxpayer standing as set forth in *Goldston*.

B. <u>Exhaustion of Administrative Remedies</u>

[3] The Board next contends that the trial court should have dismissed the complaint based on plaintiffs' failure to exhaust their administrative remedies under N.C. Gen. Stat. § 115C-369 (2007). If a plaintiff has failed to exhaust his or her administrative remedies, the court lacks subject matter jurisdiction and the action must be dismissed. *Shell Island Homeowners Ass'n v. Tomlinson*, 134 N.C. App. 217, 220, 517 S.E.2d 406, 410 (1999).

N.C. Gen. Stat. § 115C-369(a) provides:

The parent or guardian of any child, or the person standing in loco parentis to any child, who is dissatisfied with the assignment made by a local board of education may, within 10 days after notification of the assignment, or the last publication thereof, apply in writing to the local board of education for the reassignment of the child to a different public school. . . . If the application for reassignment is disapproved, the local board of education shall give notice to the applicant by registered or certified mail, and the applicant may within five days after receipt of such notice apply to the local board for a hearing. The applicant shall be entitled to a prompt and fair hearing *on the question of reassignment of such child to a different school.*

(Emphasis added.) The local board of education at the hearing "shall consider the best interest of the child, the orderly and efficient administration of the public schools, the proper administration of the school to which reassignment is requested and the instruction, health, and safety of the pupils there enrolled, and shall assign said child in accordance with such factors." N.C. Gen. Stat. § 115C-369(c).

We believe that this case is analogous to *Charlotte-Mecklenburg Hosp. Auth.*, 336 N.C. at 209, 443 S.E.2d at 722, in which the plaintiffs sought a declaration that a rule of the Industrial Commission regarding reimbursement of hospitals was invalid. The defendants contended that because the General Assembly had provided a remedy by which any matter, including charges for hospital services, could be resolved in the Industrial Commission, the plaintiff hospitals had failed to exhaust their administrative remedies by not first pursuing that avenue. *Id.*

The Supreme Court confirmed that even in a declaratory judgment action, " '[w]hen an *effective* administrative remedy exists, that remedy is exclusive.' " *Id.* (quoting *Lloyd v. Babb*, 296 N.C. 416, 428, 251 S.E.2d 843, 852 (1979)). Nonetheless, it pointed out:

> Plaintiff hospitals, however, do not seek review of an award of any *specific claims* for compensation before defendant Commission; rather, they seek a declaratory ruling that the *per diem* reimbursement rule is invalid, and injunctive relief therefrom. [The statutes] only provide for hearings, awards, and review of awards in disputes between employees and employers with respect to specific claims for compensation, and do not address challenges to rules and regulations promulgated by the Commission pursuant to the [Workers' Compensation] Act.

*Id.* at 209-10, 443 S.E.2d at 722. Because the General Assembly had not provided any procedures to challenge a rule or regulation of the Commission, it had "not provided, within the Act, an adequate remedy for plaintiffs." *Id.* at 211, 443 S.E.2d at 723. The Court, therefore, concluded that the plaintiff hospitals were not barred from proceeding for failure to exhaust administrative remedies. *Id.*

In this case, plaintiffs' complaint did not simply address the assignment of individual students. The complaint challenges the "2007-2008 Growth Management Plan" adopted by the Board that, according to plaintiffs, shifts from using year-round schools as a "stop-gap measure" on an emergency basis for overcrowding to using

it as part of "a long range 'plan for growth.' " Plaintiffs assert in their complaint that this plan "creat[es] a structural defect in the operation of [the local school system] which, once implemented, cannot be readily changed by operation of normal political processes, nor which other branches of government can correct." In their request for declaratory relief, plaintiffs seek a declaration regarding the validity of the Board's plan "and other associated regulations which, if implemented, will assign its members or children of its members to mandatory year-round schools and will expend funds in such a manner so that traditional schools will not be reasonably available now or in the future to its members." Further, plaintiffs contend that they are entitled to injunctive relief prohibiting implementation of the plan.

These claims regarding the validity of the Board's plan to use year-round schools to alleviate overcrowding do not fall within the scope of N.C. Gen. Stat. § 115C-369. Plaintiffs are not challenging specific assignment decisions, but rather an overall plan and accompanying regulations. The question presented by this case is thus not the reassignment of a particular child from one school to another school, as set forth in § 115C-369(a), and none of the factors specified in § 115C-369(c) for consideration by the Board in making a decision under this statute would address the issues regarding the validity of the plan.

The Board, however, asserts that *Cameron v. Wake County Bd. of Educ.*, 36 N.C. App. 547, 244 S.E.2d 497 (1978), dictates the outcome in this case. In *Cameron*, the plaintiffs filed a class action against the Wake County Board of Education, seeking a preliminary injunction against the enforcement of the 1977-1978 student assignment plan and a declaratory judgment that the plan was unconstitutional on the grounds that it is arbitrary and capricious. *Id.* at 547, 244 S.E.2d at 497-98. The named plaintiffs alleged "that the defendant has abdicated its student assignment responsibilities to federal bureaucrats, should have made its assignments on the basis of the welfare of the pupils, and since this was not done, the court should act on behalf of the plaintiffs." *Id.* at 550, 244 S.E.2d at 499.

In concluding that the plaintiffs had improperly failed to exhaust their administrative remedies, this Court held that plaintiffs could not disregard the predecessor statute to N.C. Gen. Stat. § 115C-369 by failing to request reassignment and "tak[e] a route wholly inconsistent with the statutes enacted by the General Assembly." *Id.* at 551, 244 S.E.2d at 500. Significantly, however, the reassignment statute would have provided precisely the relief sought by the plaintiffs:

determination by the Board, and not any federal entity, of " 'the best interests of the child' " regarding school assignment. *Id.* at 549, 244 S.E.2d at 499 (quoting N.C. Gen. Stat. § 115-178).

In this case, N.C. Gen. Stat. § 115C-369 provides no means for determining whether a plan for mandatory year-round schools is statutorily or constitutionally permitted.[3] The statute focuses on the individual assignment of a student and would not supply the relief sought in plaintiffs' complaint regarding the Board's plan and regulations. Since the Board has not pointed to any other statute that would provide an administrative remedy encompassing that sought by plaintiffs, *Charlotte-Mecklenburg Hosp. Auth.* controls, and the trial court properly denied the motion to dismiss based on failure to exhaust administrative remedies.

### C. Mootness

[4] Finally, the Board argues that plaintiffs' challenge to its plan to assign WCPSS students to year-round schools on a mandatory basis has been rendered moot due to the fact that all the plaintiffs who were initially assigned to a year-round school under its 2007-2008 assignment plan and subsequently applied for transfer have been reassigned to a traditional calendar or magnet school. "[A]ctions filed under the Declaratory Judgment Act, N.C. Gen. Stat. §§ 1-253 through -267 (2005), are subject to traditional mootness analysis." *Citizens Addressing Reassignment & Educ., Inc. v. Wake County Bd. of Educ.*, 182 N.C. App. 241, 246, 641 S.E.2d 824, 827 (2007), *disc. review denied*, 362 N.C. 234, 659 S.E.2d 438, (2008). "A case is considered moot when 'a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing controversy.' " *Lange v. Lange*, 357 N.C. 645, 647, 588 S.E.2d 877, 879 (2003) (quoting *Roberts v. Madison County Realtors Ass'n*, 344 N.C. 394, 398-99, 474 S.E.2d 783, 787 (1996)). "Courts will not entertain such cases because it is not the responsibility of courts to decide abstract propositions of law." *Id.* (internal quotation marks omitted). "Conversely, when a court's determination can have a practical effect on a controversy, the court may not dismiss the case as moot." *Id.*

In determining whether plaintiffs' claims may be considered moot, we are bound by *Goldston*. Because we hold that plaintiffs have standing to pursue a declaratory judgment regarding the Board's

---

3. We do not address whether plaintiffs' equal protection and due process claims would be barred for failure to exhaust their administrative remedies. Nothing in this decision should be viewed as expressing any opinion on that issue.

authority to establish year-round schools and to assign students to those schools on a mandatory basis, the fact that individual plaintiffs have been reassigned does not address the unsettled controversy concerning the Board's authority. *See Goldston*, 361 N.C. at 34-35, 637 S.E.2d at 882 (holding "declaratory judgment remains an appropriate remedy" despite plaintiffs' abandoning their claim "to compel return of the challenged assets" because "[i]f plaintiffs ultimately prevail, their point is made"). Stated differently, the plaintiffs' individual reassignments do not "terminate the uncertainty and controversy giving rise to th[is] action" as would a declaration that the Board does, or does not, have the authority to implement its plan. *Id.* at 34, 637 S.E.2d at 881. As a consequence, plaintiffs' claims are not moot.

II

[5] We now turn to the trial court's decision on the merits. We first note that plaintiffs, in arguing that the trial court's order should be affirmed, couch their contentions in the rhetoric of constitutional rights. The trial court, however, based its decision solely on the Board's lack of "statutory authority" and its conclusion "that mandatory year round schools are not authorized under the law." It then concluded that "there is no need to go further." The court did not address plaintiffs' state and federal constitutional claims. Since plaintiffs have not cross-assigned error on the grounds that those arguments present alternative bases for upholding the trial court's decision, they are not properly before us. *Harllee*, 151 N.C. App. at 51, 565 S.E.2d at 685.

The trial court identified the merits issue as "whether or not the Wake County Board of Education, or for that matter, any Board of Education, has the legal authority to establish mandatory year round schools? This is the critical determination in this case." We believe that the trial court's articulation of the issue actually presents two questions: (1) Does the Board have authority to establish year-round schools, and (2) does the Board have authority to assign students to such schools without their parents' consent?

With respect to the authority of the Board to establish year-round schools, the trial court's order ultimately seems to conclude that the Board does have such authority. The court specifically concluded that the Board is "authorized by law to operate, *on a voluntary consensual basis*, year round calendar schools . . . ." Even plaintiffs, in their brief to this Court, assert that the Board "misstate[s] Plaintiffs' position as an argument that school boards do not have authority to

operate year-round schools . . . ." The trial court's order, however, appears to base its requirement that attendance at such schools be only on "a voluntary consensual basis" on a lack of express statutory authority to operate such schools except as a program supplemental to traditional calendar schools. We, therefore, first address the Board's authority to create and operate year-round schools.

**[6]** The North Carolina Constitution specifies that "[t]he General Assembly shall provide by taxation and otherwise for a general and uniform system of free public schools, which shall be maintained at least nine months in every year, and wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2(1). The Constitution, however, further provides that "[t]he State Board of Education shall supervise and administer the free public school system . . . and shall make all needed rules and regulations in relation thereto, subject to laws enacted by the General Assembly." N.C. Const. art. IX, § 5. The General Assembly has codified this constitutional authority of the State Board of Education in N.C. Gen. Stat. § 115C-12 (2007), which states: "The general supervision and administration of the free public school system shall be vested in the State Board of Education. *The State Board of Education shall establish policy for the system of free public schools*, subject to laws enacted by the General Assembly." (Emphasis added.)

Nevertheless, as our Supreme Court has explained, the General Assembly "may delegate to local administrative units the power to make such rules and regulations as may be deemed necessary or expedient, and when so delegated it is peculiarly within the province of the administrative officers of the local unit to determine what things are detrimental to the successful management, good order, and discipline of the schools in their charge and the rules required to produce those conditions." *Coggins v. Bd. of Educ. of Durham*, 223 N.C. 763, 767, 28 S.E.2d 527, 530 (1944). Consistent with *Coggins*, the General Assembly has exercised its right to delegate power to local school boards by providing a broad grant of authority:

All powers and duties conferred and imposed by law respecting public schools, which are not expressly conferred and imposed upon some other official, are conferred and imposed upon local boards of education. *Said boards of education shall have general control and supervision of all matters pertaining to the public schools in their respective administrative units* and they shall enforce the school law in their respective units.

N.C. Gen. Stat. § 115C-36 (2007) (emphasis added). *See also* N.C. Gen. Stat. § 115C-40 (2007) ("Local boards of education, subject to any paramount powers vested by law in the State Board of Education or any other authorized agency shall have general control and supervision of all matters pertaining to the public schools in their respective local school administrative units . . . ."); *Hughey v. Cloninger*, 297 N.C. 86, 94, 253 S.E.2d 898, 903 (1979) ("In the scheme of public education adopted by the General Assembly, the 'general control and supervision of all matters pertaining to the public schools in their respective administrative units' is delegated to the county and city boards of education, subject to any paramount powers vested by law in the State Board of Education or any other authorized agency." (quoting N.C. Gen. Stat. § 115-27)).

In addition to this broad grant of authority, the General Assembly has also set out a list of specific powers and duties vested in local school boards. *See* N.C. Gen. Stat. § 115C-47 (2007). These enumerated powers complement the "general control and supervision" vested in local school boards by §§ 115C-36 and -40, with the result that "[e]ach County Board of Education is vested with authority to fix and determine the method of conducting the public schools in its county so as to furnish the most advantageous method of education available to the children attending its public schools." *Coggins*, 223 N.C. at 767, 28 S.E.2d at 530.

N.C. Gen. Stat. § 115C-47(11) specifies that "[l]ocal boards of education shall determine the school calendar under G.S. 115C-84.2." N.C. Gen. Stat. § 115C-84.2(a) (2007), in turn, requires that each local board of education "adopt a school calendar consisting of 215 days all of which shall fall within the fiscal year." In addition, the statute mandates "[a] minimum of 180 days and 1,000 hours of instruction covering at least nine calendar months." *Id.* The local board, however, "shall designate when the 180 instructional days shall occur." *Id.* Significantly, subsection (a) of § 115C-84.2 concludes by stressing: "Local boards and individual schools are encouraged to use the calendar flexibility in order to meet the annual performance standards set by the State Board." *Id.* Thus, local school boards have been granted the flexibility to adopt the school calendars best suited to fulfilling the State's educational mandates.

N.C. Gen. Stat. § 115C-84.2 does, however, place some limitations on the design of a school calendar, including a mandate that the calendar include 42 consecutive days when teacher attendance is not required "unless . . . the school is a year-round school." N.C. Gen.

Stat. § 115C-84.2(b)(2). Further, although reiterating that "[l]ocal boards of education shall determine the dates of opening and closing the public schools under subdivision (a)(1) of this section," the statute specifies that "[e]xcept for year-round schools, the opening date for students shall not be before August 25, and the closing date for students shall not be after June 10." N.C. Gen. Stat. § 115C-84.2(d) (emphasis added).

Thus, N.C. Gen. Stat. § 115C-47 grants local school boards broad authority to set the school calendar in accordance with N.C. Gen. Stat. § 115C-84.2, which, in turn, encourages local school boards to consider calendar flexibility as a means of achieving educational standards. N.C. Gen. Stat. § 115C-84.2 does require 180 days of instruction over "at least nine calendar months," but exempts "year-round schools" from the requirement of a 42-day break for teachers and from the restrictions on opening and closing dates. The express language exempting year-round schools from the calendar-design restrictions demonstrates that the General Assembly recognized a year-round calendar as a valid alternative to the traditional calendar (which includes a significant summer vacation).

Although the issues in this case have been discussed in terms of "traditional" calendar schools versus "year-round" calendar schools, both of these school calendar options comply with the requirements set out in § 115C-84.2(a) and (b). Indeed, there has been no suggestion that a year-round calendar such as the one adopted by the Board in this case fails to comply with N.C. Gen. Stat. § 115C-84.2. Thus, the Board has authority under these statutes to operate year-round schools.

[7] While the trial court seemed to agree that the Board has this authority, it also concluded that the Board cannot assign students to year-round schools without informed parental consent. This conclusion is precluded by N.C. Gen. Stat. § 115C-366(b) (2007), which provides:

> Each local board of education shall assign to a public school each student qualified for assignment under this section. Except as otherwise provided by law, *the authority of each board of education in the matter of assignment of children to the public schools shall be full and complete, and its decision as to the assignment of any child to any school shall be final.*

(Emphasis added.) The only restrictions placed on a Board's assignment authority are set forth in N.C. Gen. Stat. § 115C-367 (2007),

which prohibits local school boards from assigning students to a given school "on account of race, creed, color or national origin."

If, as we have held, the Board has authority to operate schools in the WCPSS on a year-round calendar, then N.C. Gen. Stat. § 115C-366(b) grants "full and complete" authority to the Board to assign children to such schools. Indeed, the Board's decision to assign a child to "any school"—which by its plain language must include all lawfully-operated schools—"shall be final." *Id.*

It appears that the trial court and plaintiffs base their requirement that any assignment to a year-round school be voluntary on a strained reading of N.C. Gen. Stat. § 115C-84.2 combined with N.C. Gen. Stat. § 115C-1 (2007). According to the trial court, N.C. Gen. Stat. § 115C-1 provides a right for students to attend a traditional calendar school:

> The text of [§ 115C-1] makes mandatory what the text of the constitution leaves discretionary. Because the constitution references the phrase "uniform school term" as being at least nine months, and the legislature has required that the term be nine months, the school term is a feature of public school uniformity inherent in the constitutional mandate of a general and uniform school system. A nine month term is therefore mandatory upon local school administrative units throughout the state. Equal access to a nine month school term is part of the constitutional privilege of a general and uniform system of free public schools and a part of "the property right" of an education.

The trial court and plaintiffs attempt to reconcile this "right" with N.C. Gen. Stat. § 115C-84.2 by reading that statute as equating "year-round schools" with voluntary "supplemental or additional educational programs or activities," as provided for in § 115C-84.2(e).

According to the trial court, "[t]he permissive use of the term year round schools in G.S. 115C-84.2(d) does not alter the force or effect of the mandatory language in G.S. 115C-1 relating to a uniform nine month term." The trial court's construction of the statutes and plaintiffs' contentions cannot be reconciled with the plain language of the statutes or prior appellate opinions.

N.C. Gen. Stat. § 115C-1 states:

> A general and uniform system of free public schools shall be provided throughout the State, wherein equal opportunities shall

be provided for all students, in accordance with the provisions of Article IX of the Constitution of North Carolina. . . . There shall be operated in every local school administrative unit a uniform school term of nine months, without the levy of a State ad valorem tax therefor.

This Court has previously held that "§ 115C-1 simply codifies the 'general and uniform' and 'equal opportunities' clauses of the Constitution . . . ." *Leandro v. State*, 122 N.C. App. 1, 14, 468 S.E.2d 543, 552 (1996), *aff'd in part and rev'd in part*, 346 N.C. 336, 488 S.E.2d 249 (1997).

Initially, we note that there is no dispute regarding whether the Constitution provides the right to a uniform nine-month term asserted by plaintiffs and recognized by the trial court; it does not. Article IX provides for a "uniform system" that "shall be maintained *at least* nine months in every year . . . ." N.C. Const. art. IX, § 2(1) (emphasis added). "[T]he word 'uniform' modifies the word 'system,' not the word 'term.' The Constitution, therefore, does not require a uniform 180 day term." *Morgan v. Polk County Bd. of Educ.*, 74 N.C. App. 169, 174, 328 S.E.2d 320, 324 (1985) (citing *Bd. of Educ. v. Bd. of Comm'rs of Granville County*, 174 N.C. 469, 473, 93 S.E. 1001, 1002 (1917)).

The language of art. IX, § 2(1) does not explicitly require uniformity with respect to the opening and closing dates. It requires the State to maintain a free public school system with a minimum quantum of instruction of nine months each year. *Frazier v. Bd. of Comm'rs of Guilford County*, 194 N.C. 49, 63, 138 S.E. 433, 440 (1927) (prior N.C. Const. art. IX, § 3, now N.C. Const. art. IX, § 2(1), "is not a limitation as to the length of the school term; it is the minimum required by the Constitution").

Our Supreme Court has also specifically considered what the references to a "uniform system" and "equal opportunities" mean:

[The North Carolina Constitution] places upon the General Assembly the duty of providing for "a general and uniform system of free public schools . . . wherein equal opportunities shall be provided for all students." N.C. Const. art. IX, § 2(1). *We conclude that at the time this provision was originally written in 1868 providing for a "general and uniform" system but without the equal opportunities clause, the intent of the framers was that every child have a fundamental right to a sound basic educa-*

*tion* which would prepare the child to participate fully in society as it existed in his or her lifetime. *The 1970 amendment adding the equal opportunities clause ensured that all the children of this state would enjoy this right.*

*Leandro v. State*, 346 N.C. 336, 348, 488 S.E.2d 249, 255-56 (1997) (emphasis added) (internal citations omitted). As § 115C-1 is a codification of the constitutional provision, this analysis necessarily also controls as to § 115C-1.

*Leandro* established that the requirement of "equal opportunities" was added to ensure that all children had equal access to a sound basic education. The Court stressed: "Although we have concluded that the North Carolina Constitution requires that access to a sound basic education be provided equally in every school district, we are convinced that the equal opportunities clause of Article IX, Section 2(1) does not require substantially equal funding *or educational advantages* in all school districts." *Leandro*, 346 N.C. at 349, 488 S.E.2d at 256 (emphasis added). Since there is no contention that plaintiffs are being denied equal access to a sound basic education by being assigned to year-round calendar schools,[4] N.C. Gen. Stat. § 115C-1 does not provide plaintiffs with a right to "equal opportunity" to attend a school with a traditional calendar.

Further, we cannot agree with the trial court's assumption that § 115C-1's reference to a "uniform school term of nine months" necessarily means a term of no more and no less than nine months. The statute, especially as a codification of the Constitution, can equally be read as setting a floor for the quantum of education required. Any other construction of the statute would place § 115C-1 in conflict with § 115C-84.2(a)(1)'s requirement that a school calendar include "[a] minimum of 180 days and 1,000 hours of instruction covering *at least nine calendar months*." (Emphasis added.)

Our Supreme Court has held that the statutes governing education "are to be construed *in pari materia*" and, "[i]f possible, they are to be reconciled and harmonized." *Bd. of Educ. of Onslow County v. Bd. of County Comm'rs of Onslow County*, 240 N.C. 118, 126, 81 S.E.2d 256, 262 (1954). In order to do so, the Court directed the following "judicial approach":

---

4. The trial court acknowledged in its order that "there is no contention that the educational opportunity offered by a year round school is better or worse than the educational opportunity offered by a traditional elementary or middle school . . . ."

"The different sections should be regarded, not as prior and subsequent acts, but as simultaneous expressions of the legislative will; but, where every means of reconciling inconsistencies has been employed in vain, the section last adopted will prevail, regardless of their relative positions in the code or revision. An unnecessary implication arising from one section, inconsistent with the express terms of another on the same subject, yields to the expressed intent, and the two sections are not repugnant."

*Id.* (quoting 82 C.J.S. *Statutes* § 385(b)). *See also Whittington v. N.C. Dep't of Human Res.*, 100 N.C. App. 603, 606, 398 S.E.2d 40, 42 (1990) ("[W]hen one statute speaks directly and in detail to a particular situation, that direct, detailed statute will be construed as controlling other general statutes regarding that particular situation, absent clear legislative intent to the contrary. . . . [S]tatutes relating to the same subject should be construed *in pari materia*, in such a way as to give effect, if possible, to all provisions without destroying the meaning of the statutes involved.").

Here, construing § 115C-1, a general statute codifying the constitutional provision, as mandating a term of precisely nine months rather than establishing a minimum term of nine months (as set out in the constitution) would conflict with the later-enacted § 115C-84.2. That more recent statute, however, specifically addresses the requirements for school calendars and requires "at least nine months." The construction of § 115C-1 adopted by the trial court is unnecessary and should, therefore, "yield[]" to the express intent in § 115C-84.2. *Bd. of Educ. of Onslow County*, 240 N.C. at 126, 81 S.E.2d at 262.

We hold, therefore, that § 115C-1, consistent with the purpose of the constitutional provision it was designed to implement, does not mandate equal access to a school term of nine consecutive months, but rather refers to the minimum quantum of educational instruction required. How that minimum quantum of instruction is translated into an annual school calendar is then prescribed by § 115C-84.2, which sets out certain requirements, but otherwise mandates that "[t]he local board shall designate when the 180 instructional days shall occur" and specifically recognizes "year-round school[s]" as a permissible calendaring scheme. N.C. Gen. Stat. § 115C-84.2(a)(1), (b)(2), (d).

The trial court and plaintiffs, however, construe § 115C-84.2 as denying local school boards the authority to operate schools on a year-round calendar except, according to the trial court, as part of

"supplemental or additional programs which supplement or add to the uniform school calendar," referencing § 115C-84.2(e). N.C. Gen. Stat. § 115C-84.2(e) states: "Nothing in this section prohibits a local board of education from offering supplemental or additional educational programs or activities outside the calendar adopted under this section." The trial court apparently believed that this subsection of § 115C-84.2 permitted year-round schools as "supplemental" to the nine-month calendar, but because such schools were merely supplemental programs, students could not be assigned to them without parental consent. We cannot accept this reading of the statute.

It is, of course, fundamental "that when construing a statutory provision, the words in the statute are to be given their natural or ordinary meaning, unless the context of the provision indicates that they should be interpreted differently." *Whittington*, 100 N.C. App. at 606, 398 S.E.2d at 42. In this case, § 115C-84.2(d) expressly exempts "year-round schools" from the statute's requirement regarding opening and closing dates of school calendars: *"Except for year-round schools,* the opening date for students shall not be before August 25, and the closing date for students shall not be after June 10." (Emphasis added.) N.C. Gen. Stat. § 115C-84.2(e) relates only to "supplemental or additional educational programs or activities *outside the calendar adopted under this section."* (Emphasis added.) Since the provision in § 115C-84.2(d) referencing "year-round schools" governs calendars permitted under the statute, "year-round schools" necessarily do not constitute programs "outside the calendar" permitted by the statute.

Nonetheless, the trial court ruled that "it is clear the way to reconcile this exception in the opening and closing of schools [in N.C. Gen. Stat. § 115C-84.2(d)] with N.C. Gen. Stat. § 115C-1 is to define year round schools or modified calendar schools as schools which are 'additional' or 'supplemental' and having a voluntary aspect to participation by students." The court then added: "[T]he only way the Legislature would allow school[] boards to operate schools which did not adhere to its protection of summer vacation provisions was to allow a school board to have 'supplemental' or 'additional' school programs."

Contrary to this assumption by the trial court, N.C. Gen. Stat. § 115C-84.2(b)(2), in fact, does specifically exempt year-round schools from the statute's apparent protection of a teacher's summer vacation: "The calendar shall include at least 42 consecutive days when teacher attendance is not required unless: (i) the school is a

year-round school . . . ." This provision—within the portions of the statute setting out standards for school calendars and unrelated to "supplemental" programs—runs counter to the trial court's construction of the statute. Indeed, the General Assembly could not have intended in this reference to "year-round schools" to equate such schools with "supplemental" or "additional" programs as set forth in N.C. Gen. Stat. § 115C-84.2(e). Subsection (b)(2) was added in 1997, 1997 N.C. Sess. Laws 443, s. 838, while subsection (e), addressing supplemental programs, did not come into existence until 2004, 2004 N.C. Sess. Laws 180, s. 1.

As support for its construction of § 115C-84.2, the trial court relied upon legislative history regarding the General Assembly's amendments to § 115C-84.2 in 2004. That legislation added the limitation on opening and closing dates (with the exception for year-round schools) and added subsection (e) discussing supplemental educational programs. 2004 N.C. Sess. Laws 180, s. 1. According to plaintiffs, the fact that the House and Senate Conference Committee that produced 2004 N.C. Sess. Law 180 chose to remove proposed definitions of "year-round schools" from the Act while adding the authorization in subsection (e) of supplemental programs necessarily means that year-round schools are supplemental or additional programs under § 115C-84.2(e).

The Supreme Court has, however, stressed that "where the language of a statute expresses the legislative intent in clear and unambiguous terms, the words employed must be taken as the final expression of the meaning intended unaffected by its legislative history." *Piedmont Canteen Serv., Inc. v. Johnson,* 256 N.C. 155, 161, 123 S.E.2d 582, 586 (1962). We believe that the language of N.C. Gen. Stat. § 115C-84.2(a)(1) and (d) is clear and unambiguous. Legislative history cannot, therefore, be relied upon to force a construction on that statute inconsistent with the plain language.

In any event, the inference drawn by the trial court and plaintiffs from the events in 2004 is at best tenuous. One can just as readily infer that the General Assembly felt that it was unnecessary to define "year-round schools" and that any such definition would inappropriately constrain local school boards from "us[ing] the calendar flexibility in order to meet the annual performance standards set by the State Board," as encouraged by N.C. Gen. Stat. § 115C-84.2(a).

Moreover, the trial court's and plaintiffs' legislative history analysis overlooks the General Assembly's adoption in 1997 of the exemp-

tion for "year-round school[s]" in the calendar limitation regarding teacher vacation days. This prior amendment adding an exception for year-round schools, long before a subsection relating to supplemental programs existed, undercuts the inference drawn by the trial court from the—at best—ambiguous legislative history.

Neither the trial court nor plaintiffs have presented any other statutory basis for a requirement of informed parental consent prior to assignment of a child to a year-round school. We note further that the trial court's approach is inconsistent with N.C. Gen. Stat. § 115C-84.2(a)'s requirement that "[l]ocal boards of education shall consult with parents and the employed public school personnel in the development of the school calendar." While this provision requires only consultation, the trial court's order requires agreement by parents in their children's calendar. "[W]hen confronted with a clear and unambiguous statute, courts 'are without power to interpolate, or superimpose, provisions and limitations not contained therein.' " *In re R.L.C.*, 361 N.C. 287, 292, 643 S.E.2d 920, 923 (quoting *In re Banks*, 295 N.C. 236, 239, 244 S.E.2d 386, 388-89 (1978)), *cert. denied*, —— U.S. ——, 169 L. Ed. 2d 396, 128 S. Ct. 615 (2007). Thus, we cannot impose a duty to obtain consent when the statute provides only a duty to consult.

We, therefore, hold that the Board has the authority under N.C. Gen. Stat. § 115C-84.2 to create and operate year-round schools. Further, no authority exists to support the trial court's requirement of informed parental consent prior to assignment to such schools. To the contrary, under N.C. Gen. Stat. § 115C-366(b), when a local school board exercises its "full and complete" authority to assign a student to a year-round school, that decision is "final" subject only to an application by the student under N.C. Gen. Stat. § 115C-369 for reassignment.

## Conclusion

We note that much of the trial court's decision as well as the materials submitted by the parties to the trial court addressed the advantages and disadvantages of a year-round calendar. Such questions are for the local boards of education, the State Board of Education, and the General Assembly to decide. As our Supreme Court stressed in its landmark education decision:

The legislature, unlike the courts, is not limited to addressing only cases and controversies brought before it by litigants. The

legislature can properly conduct public hearings and committee meetings at which it can hear and consider the views of the general public as well as educational experts and permit the full expression of all points of view as to what curricula will best ensure that every child of the state has the opportunity to receive a sound basic education.

*Leandro*, 346 N.C. at 355, 488 S.E.2d at 259. The Court "reemphasize[d] [its] recognition of the fact that the administration of the public schools of the state is best left to the legislative and executive branches of government." *Id.* at 357, 488 S.E.2d at 261.

The Court also recognized more than 60 years ago that "[i]f the opinion of court or jury is to be substituted for the judgment and discretion of the board at the will of a disaffected pupil, the government of our schools will be seriously impaired, and the position of school boards in dealing with such cases will be most precarious." *Coggins*, 223 N.C. at 769, 28 S.E.2d at 531. As the Court stated then, "complaints of disaffected pupils of the public schools against rules and regulations promulgated by school boards for the government of the schools raise questions essentially political in nature, and the remedy, if any, is at the ballot box." *Id.*

Thus, if plaintiffs disagree with mandatory assignment to year-round schools, their remedy lies with the electoral process or through communications with the legislative and executive branches of government. We cannot improve upon the incisive statement contained in the amicus brief filed on behalf of the North Carolina Association of School Administrators:

To the extent that the General Assembly wanted to limit or even eliminate "year round" calendar schools, it has the power to do so. It has not done so, obviously recognizing the importance of giving school boards the necessary flexibility to deal with diverse student populations and the particular challenges faced during a school year by different districts from the mountains to the coast, from small rural districts to large urban districts. To allow the trial court's order and reasoning to stand would significantly impair the ability of boards and school administrators to tailor school calendars and assignment policies of each district so as to provide each student an opportunity for a sound basic education and to prudently utilize the tax resources which fund that opportunity.

**HARLEYSVILLE MUT. INS. CO. v. BUZZ OFF INSECT SHIELD, L.L.C.**

[190 N.C. App. 28 (2008)]

Accordingly, we reverse the decision below and remand for entry of judgment in favor of the Board.

Reversed.

Judges McCULLOUGH and STEELMAN concur.