WAKE CARES, INC.; PATRICE LEE, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF HER MINOR CHILDREN, IAN LEE, DELANEY LEE, MARGARET LEE, AND BAILEY LEE; KATHLEEN BRENNAN, INDIVIDUALLY AND AS GUARDIAN AD LITEM OF HER MINOR CHILD, ELIZABETH BRENNAN; SCOTT P. HAVILAND AND GIHAN I. EL-HABBAL, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, AHMED HAVILAND, AYAH HAVILAND, AND IMAN HAVILAND; MICHAEL JOHN STANTON AND ANGELA · MARIE STANTON, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, JACOB STANTON, ALEXIS STANTON, DANIELLE STANTON, DALLAS STANTON, AND JORDAN STANTON; AND KIMBERLY SINNOTT AND JOHN NADASKY, INDIVIDUALLY AND AS GUARDIANS AD LITEM OF THEIR CHILDREN, REID NADASKY, SEAN NADASKY, AND JAMES NADASKY, ON BEHALF OF THEMSELVES AND OTHERS SIMILARLY SITUATED v. WAKE COUNTY BOARD OF EDUCATION AND LORI MILBERG, HORACE J. TART, CAROL PARKER, ROSA GILL, SUSAN PARRY, PATTIE HEAD, ELEANOR GOETTEE, RON MARGIOTTA, AND BEVERLEY CLARK, IN THEIR OFFICIAL CAPACITIES AS MEMBERS OF THE WAKE COUNTY BOARD OF EDUCATION

No. 230PA08

(Filed 1 May 2009)

**Schools and Education— mandatory year-round schools—statutory authority**

The Wake County Board of Education is statutorily authorized to compel attendance at year-round calendar schools. The General Assembly has conferred broad, specific, and sole authority upon local school boards to determine school calendars, and year-round schools are explicitly recognized as acceptable school calendars by N.C.G.S. § 115C-84.2. Parental consent is no more a factor in assignment to year-round schools than it is to traditional schools.

Justice EDMUNDS concurring.

Justice MARTIN dissenting.

Justices BRADY and NEWBY join in this dissenting opinion.

Justice BRADY dissenting.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, 190 N.C. App. ——, 660 S.E.2d 217 (2008), reversing and remanding an order granting summary judgment for plaintiffs entered on 3 May 2007 by Judge Howard E. Manning, Jr. in Superior Court, Wake County. Heard in the Supreme Court 16 December 2008.

*Hunter, Higgins, Miles, Elam & Benjamin, PLLC, by Robert N. Hunter, Jr.; and William Peaslee for plaintiff-appellants.*

*Tharrington Smith, L.L.P., by Ann L. Majestic and Curtis H. Allen III, for defendant-appellee Wake County Board of Education.*

*Roberts & Stevens, P.A., by Christopher Z. Campbell and K. Dean Shatley, II, for North Carolina Council of School Attorneys, amicus curiae.*

*North Carolina School Boards Association, by Allison Schafer, Legal Counsel; and Poyner Spruill LLP, by Edwin M. Speas, Jr., for North Carolina School Boards Association, amicus curiae.*

TIMMONS-GOODSON, Justice.

The question presented by this appeal is whether the North Carolina General Statutes require the Wake County Board of Education to obtain parental consent before assigning students to year-round calendar schools. Because the plain language of the statutes authorizes the creation and assignment to year-round calendar schools, we conclude the Board may assign students to year-round schools without parental consent, and we therefore affirm the decision of the Court of Appeals.

## I. Background

The underlying facts of this appeal, as found by the trial court and recited by the Court of Appeals, are undisputed. The Wake County public school system (WCPSS) is the second-largest school system in the state and one of the fastest-growing school systems in the country, having grown more than thirty percent since 2000. Over 128,000 students were enrolled during the 2006-2007 school year, and the school population is expected to gain an additional 65,000 students by 2015. The most dramatic growth and overcrowding are in schools along the N.C. 55 corridor, which includes Cary, Apex, and Holly Springs.

To accommodate the tremendous student population growth, the Wake County Board of Education (the Board) has opened thirty-three additional schools since July 2000, renovated many other schools, and plans to build thirty-one new schools by 2012. Despite the extensive construction, many Wake County schools remain extremely overcrowded and are forced to use cafeterias, libraries, auditoriums,

offices, common areas, teacher lounges, and even converted storage rooms as classrooms. School campuses are also increasingly resorting to using mobile classrooms, a situation that overtaxes facilities such as restrooms, media centers, and cafeterias.

In addition to building new schools and using more mobile classrooms, the Board has attempted to alleviate overcrowding by operating a limited number of elementary and middle schools on a multi-track year-round calendar. The WCPSS operates on three different calendars: a traditional calendar, in which school begins in late August and continues until early June; a modified calendar (a single-track year-round calendar), in which the school year begins in late July and ends in late May; and a multi-track year-round calendar. In the multi-track year-round schools, students are divided into four "tracks," each with its own schedule. Track schedules are staggered so that three tracks are in school and one track is on break at all times. Because the multi-track system allows year-round schools to use their buildings twelve months a year, rather than nine, a year-round school can accommodate up to one-third more students than a traditional calendar school. Regardless of which calendar students follow, all students attend school for 180 days. Year-round students receive the same amount of vacation time as those at traditional calendar schools; the vacation time is simply spread throughout the year, rather than limited to the summer months. Year-round students also have the same holidays as students on the traditional calendar.

In September 2006 the Board voted to convert nineteen elementary and three middle schools to a year-round calendar starting in the 2007-2008 school year. On 6 February 2007, after holding three public hearings, the Board approved its final student assignment plan for the 2007-2008 school year. Under that plan, 20,717 students were assigned to newly-converted or newly-built year-round schools. Previously 17,855 of those students had been assigned to traditional calendar schools.[1]

On 13 March 2007, plaintiffs filed a complaint for declaratory judgment and injunctive relief from the Board's assignment plan, asserting that the Board lacked the authority to convert traditional

---

1. Contrary to Justice Martin's assertion that this case arises from the Board's decision to "change its year-round school program from voluntary to mandatory," each year-round school has had a portion of students involuntarily assigned to it since 2003. Thus, the Board has not "changed" its program, merely expanded it to encompass more students, including plaintiffs' children. It is this expansion of mandatory year-round school assignment that has prompted the instant case.

calendar schools to year-round schools and then assign WCPSS students to those schools on a mandatory basis. Upon hearing the matter, the trial court concluded the Board was authorized to operate and assign students to year-round calendar schools, but only with "informed parental consent." Accordingly, the trial court entered an order prohibiting the Board from requiring "the attendance of students at year round calendar schools without informed parental consent."

The Board appealed to the Court of Appeals, which unanimously reversed the trial court, holding that "the Board is authorized by the General Assembly to establish year-round schools and to assign students to attend those schools without obtaining their parents' prior consent." *Wake Cares, Inc. v. Wake Cty. Bd. of Educ.*, —— N.C. App. ——, ——, 660 S.E.2d 217, 220 (2008). We dismissed plaintiffs' appeal based on a substantial constitutional question, but allowed their petition for discretionary review. We now affirm the decision of the Court of Appeals.

## II. Analysis

The trial court and plaintiffs agree that the Board has the authority to create and to assign students to year-round calendar schools. Plaintiffs argue, however, that the Board must obtain parental consent before assigning students to year-round schools. We must therefore determine whether parental consent is a prerequisite condition to year-round school assignment by the Board under the North Carolina General Statutes.

We begin by recognizing that local boards of education have broad general statutory power to control and supervise public schools:

> All powers and duties conferred and imposed by law respecting public schools, which are not expressly conferred and imposed upon some other official, are conferred and imposed upon local boards of education. Said boards of education shall have general control and supervision of all matters pertaining to the public schools in their respective administrative units and they shall enforce the school law in their respective units.

N.C.G.S. § 115C-36 (2007); *see also id.* § 115C-40 (2007) ("Local boards of education, subject to any paramount powers vested by law in the State Board of Education or any other authorized agency shall have general control and supervision of all matters pertaining

**WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.**

[363 N.C. 165 (2009)]

to the public schools in their respective local school administrative units . . . ."). Thus, unless such power is expressly delegated elsewhere, local school boards possess the inherent authority to control and supervise "all matters pertaining to the public schools." *Id.*

In addition to the broad grant of authority reserved under N.C.G.S. § 115C-36, section 115C-47 sets forth a list of fifty-four specific powers and duties vested in local boards of education. N.C.G.S. § 115C-47 (2007). Such powers and duties include the duty to provide "adequate school systems," *id.* § 115C-47(1), to "assure appropriate class size," *id.* § 115C-47(10), and, notably, to "determine the school calendar," *id.* § 115C-47(11). Indeed, N.C.G.S. § 115C-47(11) instructs that "[l]ocal boards of education shall determine the school calendar under G.S. 115C-84.2." Clearly, local boards of education are not only authorized, but statutorily required to set school calendars, subject to N.C.G.S. § 115C-84.2. With these broad powers and duties in mind, we therefore turn to the specific school calendar guidelines of N.C.G.S. § 115C-84.2.

Subsection 115C-84.2(a) states that "[e]ach local board of education shall adopt a school calendar consisting of 215 days all of which shall fall within the fiscal year." *Id.* § 115C-84.2(a) (2007). School calendars must include a "minimum of 180 days and 1,000 hours of instruction covering at least nine calendar months." *Id.* § 115C-84.2(a)(1). The statutory requirement of school calendars covering at least nine calendar months comports with Article IX of the North Carolina Constitution, which states that a "general and uniform system of free public schools . . . shall be maintained at least nine months in every year." N.C. Const. art. IX, § 2, cl. 1. These nine months represent only the minimum amount of time required for instruction; the legislature may provide for a longer term if desired. *Harris v. Bd. of Comm'rs*, 274 N.C. 343, 353, 163 S.E.2d 387, 394 (1968); *Frazier v. Bd. of Comm'rs*, 194 N.C. 49, 63, 138 S.E. 433, 440 (1927). The local board "shall designate when the 180 instructional days shall occur." N.C.G.S. § 115C-84.2(a)(1); *see also id.* § 115C-84.2(d) (2007) ("Local boards of education shall determine the dates of opening and closing the public schools . . . .").

Section 115C-84.2 does not classify school calendars as "traditional," "modified," or "year-round," nor does it express any preference as to the school calendars local boards should adopt. N.C.G.S. § 115C-84.2 indicates, however, that local school boards may devise different types of school calendars to achieve educational goals:

"Local boards and individual schools are encouraged to use the calendar flexibility in order to meet the annual performance standards set by the State Board." *Id.* § 115C-84.2(a). Notably, N.C.G.S. § 115C-84.2 specifically recognizes year-round schools as a legitimate calendar option. While N.C.G.S. § 115C-84.2 places some limitations on school calendars, *see id.* § 115C-84.2(b) (2007), year-round schools are expressly exempted from several of these limitations. For example, a school calendar "shall include at least 42 consecutive days when teacher attendance is not required unless . . . the school is a year-round school." *Id.* § 115C-84.2(b)(2) (emphasis added). Further, "*[e]xcept for year-round schools*, the opening date for students shall not be before August 25, and the closing date for students shall not be after June 10." *Id.* § 115C-84.2(d) (emphasis added). Thus, N.C.G.S. § 115C-84.2 explicitly acknowledges year-round calendars as a valid school calendar option. We find no statutory restrictions or legislative disapproval of the use of year-round school calendars in N.C.G.S. § 115C-84.2. To the contrary, subsection 115C-84.2(a) encourages local school boards to utilize calendar flexibility.

Having determined that utilization of a year-round calendar is authorized and, indeed, even to some extent encouraged, there remains only the question of whether parental consent plays any role in the year-round school assignment process. The plain language of our General Statutes expressly rejects any such implication. School assignment is solely within the power of the local school board, and "[e]xcept as otherwise provided by law, the authority of each board of education in the matter of assignment of children to the public schools shall be full and complete, and its decision as to the assignment of any child to any school shall be final." *Id.* § 115C-366(b) (2007).

Although N.C.G.S. § 115C-84.2(a) states that "[l]ocal boards of education shall consult with parents and the employed public school personnel in the development of the school calendar," *id.* § 84.2(a) (emphasis added), it does not require parental consent in developing school calendars, nor does it implicate school *assignment* in any manner. Parents who are dissatisfied with their child's school assignment may apply to the local school board for reassignment and receive a hearing on the matter. *See id.* § 115C-369 (2007). At such hearing, the local board must consider "the best interest of the child, the orderly and efficient administration of the public schools, the proper administration of the school to which reassignment is requested and the instruction, health, and safety of the pupils there

enrolled, and shall assign said child in accordance with such factors." *Id.* § 115C-369(c). Any final determination by the local board as to reassignment is then subject to judicial review. *Id.* § 115C-370 (2007).

In sum, the General Assembly has conferred broad, specific, and sole authority upon local school boards to determine school calendars. Moreover, N.C.G.S. § 115C-84.2 explicitly recognizes year-round calendars as acceptable school calendars. As such, parental consent is no more a factor in assignment to year-round schools than it is to traditional schools. When assignment to a particular school places too great a burden on individual children, as is alleged by plaintiffs in the instant case, parents may seek reassignment and judicial review of any assignment decision.

Plaintiffs argue, however, that N.C.G.S. § 115C-1 requires the Board to operate and provide equal access for all students to traditional calendar schools. N.C.G.S. § 115C-1 states:

A general and uniform system of free public schools shall be provided throughout the State, wherein equal opportunities shall be provided for all students, in accordance with the provisions of Article IX of the Constitution of North Carolina. . . . There shall be operated in every local school administrative unit a uniform school term of nine months, without the levy of a State ad valorem tax therefor.

*Id.* § 115C-1 (2007). Plaintiffs contend there are fundamental differences in the educational experiences and opportunities available to children attending year-round schools and those attending traditional calendar schools. According to plaintiffs, year-round schools are therefore not part of a "uniform system" of public schools under N.C.G.S § 115C-1. Thus, plaintiffs reason, while the Board may offer year-round schools as an alternative to traditional schools, it must give all students the option of attending a traditional calendar school, and the Board cannot compel students to attend a non-traditional calendar school. Further, contend plaintiffs, N.C.G.S. § 115C-1 requires "a uniform school term of nine months," and that the word "term" indicates that such nine months must be consecutive, rather than spread throughout the calendar year. We are not persuaded.

Section 115C-1 merely codifies our state's constitutional requirement of "a general and uniform system of free public schools, which shall be maintained at least nine months in every year." N.C. Const. art. IX, § 2, cl. 1. This constitutional requirement that the public

school system be "uniform" in no way implicates the school calendar. *See Bd. of Educ. v. Bd. of Cty. Comm'rs*, 174 N.C. 469, 473, 93 S.E. 1001, 1002 (1917) (noting that the term "uniform" qualifies the word "system" and requires only that provision be made "for establishment of schools of like kind throughout all sections of the State and available to all of the school population of the territories contributing to their support" (citations omitted)). The "general and uniform" system of public schools indicates "a fundamental right to a sound basic education." *Leandro v. State*, 346 N.C. 336, 348, 488 S.E.2d 249, 255 (1997). The constitutional guarantee of the opportunity for a sound basic education does not require, however, "that equal educational opportunities be afforded students in all of the school districts of the state." *Id.* at 351, 488 S.E.2d at 257. Plaintiffs do not argue that year-round schools fail to provide a sound basic education. In fact, the trial court found that "there is no contention that the educational opportunity offered by a year round school is better or worse than the educational opportunity offered by a traditional elementary or middle school." Thus, while the educational opportunities available to children attending year-round schools may differ from those available to pupils at traditional schools, these differences do not remove year-round calendar schools from the "uniform system" of public schools.

Further, on its face, N.C.G.S. § 115C-1 does not require that the school term consist of nine consecutive months or otherwise dictate the manner in which the school term should be calendared. Plaintiffs' reading of the word "term" to mandate nine consecutive months places the very general language of section 115C-1 in conflict with the specific guidelines of section 115C-84.2, a position repugnant to our canons of statutory interpretation. *See Bd. of Educ. v. Bd. of Cty. Comm'rs*, 240 N.C. 118, 126, 81 S.E.2d 256, 262 (1954) (stating that " '[a]n unnecessary implication arising from one [statutory] section, inconsistent with the express terms of another on the same subject, yields to the expressed intent' " (citations omitted)). We agree with the Court of Appeals that N.C.G.S. § 115C-1, "consistent with the purpose of the constitutional provision it was designed to implement, does not mandate equal access to a school term of nine consecutive months, but rather refers to the minimum quantum of educational instruction required." *Wake Cares*, —— N.C. App. at ——, 660 S.E.2d at 231. Plaintiffs offer no other statutory support for their position, and we have found none. We conclude N.C.G.S. § 115C-1 does not limit the Board's authority to assign students to year-round schools.

WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.

[363 N.C. 165 (2009)]

### III. Conclusion

We hold that the Board is statutorily authorized to compel attendance at year-round calendar schools. The Board's action in converting traditional calendar schools to year-round calendar schools comports with its statutory duty to provide a school system adequate to the needs of increasing student enrollment while assuring appropriate class sizes in its schools. See N.C.G.S. § 115C-47(1), (10). Moreover, the more efficient use by year-round calendar schools of existing school facilities complies with the public policy of the state to create a public school system "in the most cost-effective manner" while ensuring a sound basic education for all North Carolina children. *Id.* § 115C-408(a) (2007).

We recognize the emotional nature of this case, but we must emphasize that our duty goes no further than to determine the legal authority for implementing mandatory year-round schools, not the wisdom of such a decision. This Court cannot substitute its own judgment for that of the Board. *See Leandro*, 346 N.C. at 357, 488 S.E.2d at 261 ("[T]he administration of the public schools of the state is best left to the legislative and executive branches of government."); *see also Coggins ex rel. Coggins v. Bd. of Educ.*, 223 N.C. 763, 769, 28 S.E.2d 527, 531 (1944). As noted by the Court of Appeals, "if plaintiffs disagree with mandatory assignment to year-round schools, their remedy lies with the electoral process or through communications with the legislative and executive branches of government." *Wake Cares*, —— N.C. App. at ——, 660 S.E.2d at 233. We agree, and we affirm the decision of the Court of Appeals.

AFFIRMED.

Justice EDMUNDS concurring.

I concur with the majority holding affirming the Court of Appeals reversal of the trial court's order. However, while I acknowledge the grave difficulties faced by defendant Wake County Board of Education and detailed in the majority opinion, I write separately to emphasize that this Court's decision is compelled by the applicable constitutional provisions and statutes.

Nevertheless, plaintiffs are not without recourse. The record includes affidavits from individual plaintiffs establishing that mandatory year-round schools will be inordinately disruptive in their family lives. Under section 115C-369, parents or guardians of any student

assigned to a year-round school may seek reassignment and apply for a mandatory hearing if the request is denied. N.C.G.S. § 115C-369(a) (2007). At such a hearing, one of the factors that "shall" be considered is "the best interest of the child." *Id.* § 115C-369(c) (2007). I cannot believe that "best interest" does not include at least some of the factors raised by plaintiffs, such as sibling placement, family schedules, and the like.

Moreover, plaintiffs have the ultimate remedy of the ballot box. *Id.* § 115C-37 (2007) (mandating election of county boards of education). While boards of education must make difficult choices as to how to allocate scarce resources, those boards are responsible to the voters, who have the power both to elect candidates of their choice and to unseat incumbents.

For the reasons given above, I concur in the majority opinion.

Justice MARTIN dissenting.

This case arises from the decision of the Wake County Public School System (WCPSS) to change its year-round school program from <u>voluntary</u> to <u>mandatory</u>. Despite a tradition of using year-round schools as a voluntary supplemental program, and in the absence of specific legislative authorization, WCPSS mandatorily placed approximately 20,000 students at schools operating on year-round calendars.[2] These students were not offered placements at schools operating on the traditional school schedule, as had previously been the expectation of students and families within WCPSS. The actions of WCPSS violate the North Carolina school calendar law. They are also inconsistent with long-standing education practice in this State. Because WCPSS exceeded its authority when it materially and substantially changed the school calendar for some of its students, I respectfully dissent.

As Judge Manning observed, mandatory placement on a year-round calendar "is a systemic, material change for the students and families" so affected. Since the advent of public education in North Carolina over 160 years ago, the overwhelming majority of our schools have operated on a traditional calendar. Although breaks from educational tradition may prove valuable and effective, the

---

2. This new policy was initiated in 2003 with a small number of students but has now been expanded to approximately 20,000 students. The instant case is the first legal challenge to the new policy.

process used to implement such fundamental policy changes must necessarily comply with the law.

The legislature has not authorized any local school board to mandate year-round schooling for public school students. It is unreasonable to suggest that the legislature's 2004 amendment to the school calendar statute, which was enacted to preserve summer vacation, was actually intended to grant local school boards the authority to impose on public school students a schedule that requires them to attend school throughout the summer months. A careful reading of the applicable statutes reveals that they prohibit a local school board from mandating that students attend a year-round calendar.

The trial court properly preserved our students' legal right to attend a traditional calendar school. This Court should require the local board to direct its policy arguments to the General Assembly. The consequences of the majority's decision are starkly different from those of the trial court's order. Instead of maintaining the status quo and allowing the General Assembly to consider and clearly resolve this important policy question, the majority's holding opens the door for any local school board in North Carolina to impose mandatory year-round schools.

Despite the long history of public education in North Carolina, year-round schooling is a relatively recent innovation. The practice began in our State as an experimental program in which student and family participation was purely voluntary. WCPSS opened North Carolina's first year-round school in 1989, and interested parents sought admission for their children via an application process. In 1991 the State Board of Education (State Board) issued a policy statement supporting local boards' study and exploration of year-round "models." See N.C. State Bd. of Educ., Policy Manual, Policy No. EEO-G-000 (titled "Policy supporting local efforts to implement year-round education models") (Dec. 5, 1991), available at http://sbepolicy.dpi.state.nc.us. The local board implemented the State Board's policy throughout the 1990s, opening a handful of voluntary year-round schools each year.

According to the local board's own account, for most of their short history, year-round schools in WCPSS have operated only with the support of local communities and the consent of individual attendees. For example, in 1992 the local board discarded its original proposal for the first year-round middle school due to "negative community response," whereas the first conversion of a traditional

elementary school to a year-round calendar was spawned by "[a] high level of staff and parent support." During the 1995-1996 school year, the local board approved a plan for "expanding the voluntary year-round calendar" in the upcoming years. In 1999 a citizens' advisory committee recommended that WCPSS "provide more optional year-round schools, especially in areas where the year-round option does not currently exist." In sum, WCPSS and children and families functioned under the premise that students necessarily retained the right to attend traditional calendar schools.

In 2003 the local board removed the traditional calendar option for a small number of students by mandatorily placing them at year-round schools that were otherwise populated by willing applicants. In 2006 the local board substantially expanded the new policy by developing a comprehensive plan to impose year-round schooling on a significant percentage of students. During the 2006-2007 school year, the board opened five new multi-track year-round schools populated almost entirely by mandatory placements. That year, nearly 7,000 students were involuntarily placed at year-round schools. Furthermore, the local board voted to convert nineteen additional elementary schools and three additional middle schools to a multi-track year-round schedule beginning in the 2007-2008 term. The board's plan for the 2007-2008 term more than doubled both the number of schools designated as year-round and the number of students mandatorily slotted for year-round schools. Nearly 18,000 students who attended traditional calendar schools during the 2006-2007 school year faced involuntary placement at year-round schools in 2007-2008, bringing the total number of mandatory year-round placements to over 20,000. The local board stated that a mandatory year-round schedule for these students was necessary to address existing and anticipated overcrowding.

The year-round school schedule is fundamentally different from the traditional schedule. Specifically, the multi-track year-round schedule replaces the traditional nine and a half month instructional period followed by a two and a half month summer vacation with four rotating intervals of nine instructional weeks followed by three vacation or "track out" weeks.

Although families who elected to participate in year-round schooling presumably felt there were benefits to that schedule, the resistance of other families to a mandatory year-round program is not surprising. At least some children and families have benefitted from, and indeed have come to rely upon, summer vacation. The

long summer break gives children the opportunity to learn about subjects school does not teach through methods school cannot use. During the summer students may pursue a passion for an instrument or sport, gain and hone skills like computer programming for future employment, spend time with family near and far, expand their perspectives by making friends from outside their neighborhoods while at camp, or simply learn self-direction as they plot their own course each day. The year-round schedule seriously hinders these opportunities, enjoyed by virtually every generation of North Carolina's children, and upsets families' reliance on the traditional summer vacation.

In this case, plaintiffs allege the following hardships arising from mandatory placement of public school students at year-round schools:

(1) Children within the same family unit are placed at both traditional and year-round calendar schools. Different vacation periods for children within the same family unit deprive siblings of bonding time and significantly reduce the periods available for family travel.

(2) Lack of a traditional summer vacation prevents extended trips to visit out-of-state relatives and potentially interferes with shared custody arrangements in which one divorced parent lives outside of North Carolina.

(3) Children enrolled in year-round schools cannot participate in some valuable summer programs that are scheduled to accommodate the much larger number of children who attend traditional calendar schools. Such activities include day camp; music, art, and dance programs; sports leagues; educational and university enrichment programs; and religious education and activities. For example, year-round students are precluded from participating in, among other things, the Duke University Talent Identification Program for academically gifted students and the North Carolina State University Summer Reading Skills Program (http://continuingeducation. ncsu.edu/reading/).(http://continuingeducation.ncsu.edu/reading/)

(4) Some parents, including many teachers, have chosen jobs with schedules matching the traditional school calendar, enabling them to stay at home with their children during the summer. When children of these parents are placed at year-round schools, the parents must choose between finding and paying for child care during the periodic three-week breaks, or quitting their jobs.

(5) Year-round schooling imposes financial hardships on many families. Particularly, year-round families often face increased difficulty and expense in securing child care arrangements because the frequent three-week track out periods preclude utilization of more traditional and less expensive child care options such as older students, summer nannies, or day care. For instance, the YMCA's track out program, recommended to parents by WCPSS, costs $1,885 per year per child.

In sum, plaintiffs contend that the periodic rotation in and out of school and the loss of summer vacation alter the personal development of students and interfere with many important facets of family life. Weighing the detrimental impact on individual families against the challenges facing WCPSS requires thorough examination and resolution of the mandatory year-round question by the appropriate policy-setting bodies for public education. The local board is not one of those bodies.

The General Assembly, State Board, and local school boards have different institutional roles with respect to education administration. Consideration of these roles indicates that absent legislative authorization, local boards may not fundamentally alter the customary public school calendar.

Under the North Carolina Constitution and Chapter 115C of our General Statutes, the General Assembly and State Board are responsible for setting major educational policy. Our State Constitution states that "[t]he General Assembly shall provide . . . for a general and uniform system of free public schools," and "[t]he State Board of Education shall supervise and administer the free public school system . . . and shall make all needed rules and regulations in relation thereto." N.C. Const. art. IX, §§ 2(1), 5. No such constitutional authority is vested in local boards of education.

Section 115C-12 of the General Statutes builds upon the constitutional provisions and specifically charges the State Board with establishing educational policy: "The general supervision and administration of the free public school system shall be vested in the State Board of Education. The State Board of Education shall establish policy for the system of free public schools, subject to laws enacted by the General Assembly." N.C.G.S. § 115C-12 (2007). Local boards, on the other hand, are charged with "enforc[ing] the school law in their respective units." N.C.G.S. § 115C-36 (2007).

Local boards are not well suited to consider implementation of mandatory year-round schooling without guidance from the General Assembly. There are statewide ramifications to such a substantial policy shift. Although the local board asserts cost-savings from its use of year-round schools, the long-term implications—financial, educational, or otherwise—of imposing year-round schedules on children and families are simply not clear from the present record. The General Assembly is far better situated than any one local school board to balance the benefits of maintaining the traditional calendar for students, families, industries such as tourism, or other parties against any benefits of year-round schooling to facility use, academic achievement, or other interests.

Moreover, the majority's proposed recourse for affected families, assignment appeals procedures and local school board elections, ignores the factual record. The trial court's findings specifically refute any assertion that application by year-round students for reassignment to traditional calendar schools constitutes a practical solution. See N.C.G.S. § 115C-369 (2007) (permitting application to the local board for reassignment to a different school). Indeed, the trial court found that "the assignment appeals process under G.S. 115C-366, et seq. is futile and inadequate." In this regard, the trial court observed that the traditional calendar seats available for reassignment "are materially fewer in number than [the] . . . seats mandatorily assigned to four (4) track year round schools under the [board's] conversion plan." Additionally, the board's policy requires at least some of the families who are granted reassignment to provide their own transportation to the traditional calendar schools, which the trial court found "imposes an undue burden and expense on the parents."

With respect to the political process: The vast majority of Wake County students are not affected by the compulsory year-round policy, and the students who are affected all reside in a particular area within the county. Together, these factors mean that year-round students and their families are unlikely to muster the political strength necessary to avoid selective imposition of mandatory year-round schooling. In sum, the inevitable difficulties associated with unilateral imposition of mandatory year-round placements at the local level emphasize the importance of the General Assembly's statewide consideration of this issue.

Although the role local boards play in the operation of our public schools is important and multi-faceted, see, e.g., N.C.G.S. § 115C-47

(2007) (listing approximately fifty of the powers and duties vested in local boards by the legislature), this Court has previously stated that it is the General Assembly that "has the power to provide for a longer term for the public schools of the State." *Frazier v. Bd. of Comm'rs*, 194 N.C. 49, 63, 138 S.E. 433, 440 (1927). We have also observed, "Whether the term shall exceed the minimum fixed by the Constitution must be determined from time to time by the General Assembly, in accordance with its judgment, and in response to the wishes of the people of the State." *Id.* Only after our General Assembly decides that mandatory year-round calendars are appropriate in this State may a local school board impose such calendars within its district.

A careful and reasoned analysis of the calendar statute reveals that the General Assembly has not granted local boards the power to impose mandatory year-round schooling. *See* N.C.G.S. § 115C-84.2 (2007). First, the statute prohibits a local board from adopting a school calendar that violates the opening and closing dates set by section 115C-84.2(d). Second, as explained below, the statute precludes local boards from mandating that different children attend different school calendars. For these reasons, the local board lacked authority to place students at year-round schools on an involuntary basis.

The local board's placement of students on a year-round calendar violates the calendar statute's limitations on opening and closing dates. Section 115C-84.2(d) states that school shall not begin before August 25 nor end after June 10. § 115C-84.2(d). A year-round calendar, which includes instructional days outside the allowed period, does not comply with this provision. The majority holds that statutory exemptions of year-round schools from the opening and closing date requirements permit local boards to adopt mandatory year-round calendars. *See id.* ("Except for year-round schools, the opening date for students shall not be before August 25, and the closing date for students shall not be after June 10."); *see also* § 115C-84.2(b)(2) (exempting year-round schools from the mandatory teacher vacation requirement).

The majority's holding does not comport with our canons of statutory interpretation. In reading a statute, this Court routinely seeks the intent of the legislature. *See Lithium Corp. of Am. v. Town of Bessemer City*, 261 N.C. 532, 536, 135 S.E.2d 574, 577 (1964) (stating that, when the meaning of a statute is unclear, "[t]he spirit and intent of an act controls its interpretation"). Further, provisions

"should be construed in a manner which tends to prevent them from being circumvented." *Meads v. N.C. Dep't of Agric.*, 349 N.C. 656, 666, 509 S.E.2d 165, 172 (1998).

The legislature added the opening and closing date requirements and accompanying exception for year-round schools in a 2004 amendment. *See* Act of July 18, 2004, ch. 180, sec. 1, 2004 N.C. Sess. Laws 701, 704 (codified at N.C.G.S. § 115C-84.2(d)). It is illogical to reason that, in an amendment expressly bounding the school year and thereby preserving the traditional summer break, the legislature meant to allow all local boards to eliminate that break by imposing mandatory year-round calendars. That interpretation, adopted by the majority, permits the exception to swallow the overarching intent of the amendment: to curtail calendar expansion and protect summer vacation. The more reasonable interpretation of the statute is that the legislature, aware of year-round schools operating on a small-scale, voluntary basis throughout the State, included the statutory exception to allow for their continued existence. Had the legislature intended to allow mandatory year-round schooling for every North Carolina student—a startling break from over 160 years of educational practice—it could have, and would have, done so in a straightforward fashion.

Furthermore, other provisions of the calendar statute prohibit a local board from placing some children on a customary school schedule but placing other children on a year-round schedule. These provisions require that, for purposes of the mandatory calendar, all students in a single administrative unit attend school on the same days. Section 115C-84.2(a) states that "[e]ach local board of education shall adopt a school calendar" and "shall designate when the 180 instructional days shall occur." § 115C-84.2(a). "A school calendar" means one school calendar, which the local board must adopt for all students in its administrative unit. *Id.* The statute then instructs the board to choose "the 180 instructional days." *Id.* The plain language indicates that the board must adopt a single set of 180 instructional days in setting its mandatory calendar.

The calendar statute does not permit variation within the local unit with respect to the 180 instructional days of the mandatory calendar. When the General Assembly did intend to grant flexibility within the unit, it did so explicitly. For example, the legislature expressly allowed for variation among schools with respect to instructional hours. *See* § 115C-84.2(a)(1) ("The number of instructional hours in an instructional day may vary . . . and does not have to be

uniform among the schools in the administrative unit."). Additionally, the legislature permitted local boards to schedule certain calendar days beyond the 180 instructional days "in consultation with each school's principal for use as teacher workdays, additional instructional days, or other lawful purposes." § 115C-84.2(a)(5). The language used in these provisions is markedly different from that discussing the basic 180 days, see § 115C-84.2(a)(1) ("The local board shall designate when the 180 instructional days shall occur."), which leaves no room for flexibility within the local unit. Moreover, in a recent amendment, the legislature deleted a sentence found in prior versions of the statute providing that "[d]ifferent opening and closing dates may be fixed for schools in the same administrative unit." *See* ch. 180, sec. 1, 2004 N.C. Sess. Laws at 704. Because the legislature capably expressed its intent to allow for flexibility within the local unit in certain instances, but declined to allow for variation regarding the 180 instructional days, those days must be the same for every school in the unit.

Local boards may not mandate multiple, wholly different sets of 180 instructional days for different schools or students in the same administrative unit. *See* § 115C-84.2. Students on a year-round calendar attend school on different days than do students on a traditional calendar. Therefore, the local board's imposition of mandatory year-round schooling on certain students in its unit, while other students remain at traditional schools, violates the calendar statute.[3]

The local board may, however, continue to offer year-round schooling as a <u>voluntary</u> program. This authority is found in section 115C-84.2(d)'s exemption of year-round schools from the opening and closing date requirements and in section 115C-84.2(e), which provides: "Nothing in this section prohibits a local board of education from offering supplemental or additional educational programs or activities outside the calendar adopted under this section." § 115C-84.2(d), (e). The reference in section 115C-84.2(e) to "additional programs" encompasses year-round schooling.[4]

---

3. A multi-track schedule on its own violates the calendar statute, because the different tracks operate to assign students in the same administrative unit to different sets of 180 instructional days.

4. Year-round schooling is described elsewhere in the education statutes as an optional program. *See* N.C.G.S. § 115C-238.31(a) (2007) (listing "[c]alendar alternatives," including year-round school, in Article 16, titled "Optional Programs"). Like year-round schooling, the other optional programs discussed in Article 16, including adult education programs, summer schools, and charter schools, are far more extensive than mere after school activities. *See* N.C.G.S. §§ 115C-230 to -238.55 (2007). For

These additional programs, however, must be voluntary. This conclusion derives from the plain language of section 115C-84.2(e): "Nothing . . . prohibits a local board of education from *offering*" the additional programs. § 115C-84.2(e) (emphasis added). The definition of an offer is to "present[] something for acceptance." *Black's Law Dictionary* 1113 (8th ed. 2004). Therefore, the board is authorized to offer programs with alternative calendars, including year-round, but it is not authorized to compel their acceptance. Rather, the local board must make available, to all students who wish, a spot in a school operating on the traditional calendar. *See* § 115C-84.2(d) (setting allowable school starting and ending dates). Though students may opt for a year-round school, they retain the right to attend a school operating on the traditional calendar.

The majority points to section 115C-36 in concluding that a local school board may place students at year-round schools. *See* § 115C-36 (conferring on local boards of education "[a]ll powers and duties conferred and imposed by law respecting public schools[] which are not expressly conferred and imposed upon some other official" and providing that local boards "shall have general control and supervision of all matters pertaining to the public schools in their respective administrative units"). The majority further points to section 115C-47(11), which provides that local boards "shall determine the school calendar under G.S. 115C-84.2." § 115C-47(11).

Both the residual power to supervise the public schools and the general authority to determine the local school calendar, however, must yield to the more specific limitations imposed by the legislature in section 115C-84.2. "Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together and harmonized . . . ; but, to the extent of any necessary repugnancy between them, the special statute . . . will prevail over the general statute. . . ." *Krauss v. Wayne Cty. Dep't of Soc. Servs.*, 347 N.C. 371, 378, 493 S.E.2d 428, 433 (1997) (internal quotation marks omitted) (quoting *McIntyre v. McIntyre*, 341 N.C. 629, 631, 461 S.E.2d 745, 747 (1995) (alterations in original)). Section 115C-36 is a general statute, in that it grants to local boards "general control and supervision of all matters pertaining to the public schools," but addresses no specific area of control. § 115C-36. Section

instance, a large portion of the Article is devoted to charter schools, which constitute a full replacement for the customary public education program. *See* §§ 115C-238.29A to -238.29K.

115C-47(11) is more specific, in that it directs local boards to determine the school calendar, but it expressly states that such a determination must be in accord with section 115C-84.2. § 115C-47(11). Section 115C-84.2 sets out "minute and definite" requirements and the limited circumstances under which those requirements may be waived. *Krauss*, 347 N.C. at 378, 493 S.E.2d at 433 (quoting *McIntyre*, 341 N.C. at 631, 461 S.E.2d at 747). As discussed, mandatory year-round schools violate the provisions of section 115C-84.2. Accordingly, the argument that Chapter 115C's general grant of residual authority permits this violation is inconsistent with well established canons this Court uses to discern legislative intent.

Additionally, the majority's reliance on section 115C-366(b), which gives local boards authority to assign students to the public schools, is misplaced. As stated by the trial court, this is not a case about the assignment of students to a particular school. Rather, this case is about the local board's decision to "materially and decisively change the schedule and manner in which students and their families are required to attend school during the calendar year." Section 115C-366 itself states that the local board's assignment authority is complete and final "[e]xcept as otherwise provided by law." N.C.G.S. § 115C-366(b) (2007). Because section 115C-84.2 requires operation of a calendar beginning no sooner than August 25 and ending no later than June 10, and because it requires that local boards make that calendar available to all students, the local board is prohibited from mandatorily placing students at year-round schools.

Perhaps because year-round schooling is a fairly recent development in North Carolina and has thus far been implemented on an experimental, overwhelmingly voluntary basis, our General Assembly has not yet taken the opportunity to address the propriety of mandatory year-round calendars. In this situation, when the current statutes do not permit mandatory year-round calendars, the local board must argue the benefits of its new education policy to the legislature rather than to this Court.

The legislature is best equipped to craft a solution that balances the legitimate needs of local school systems with the interests of students and their families. *See Leandro v. State*, 346 N.C. 336, 357, 488 S.E.2d 249, 261 (1997) ("[T]he administration of the public schools of the state is best left to the legislative and executive branches of government.").

**WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.**

[363 N.C. 165 (2009)]

The members of the General Assembly are popularly elected to represent the public for the purpose of making just such decisions. The legislature, unlike the courts, is not limited to addressing only cases and controversies brought before it by litigants. The legislature can properly conduct public hearings and committee meetings at which it can hear and consider the views of the general public as well as educational experts and permit the full expression of all points of view . . . .

*Id.* at 355, 488 S.E.2d at 259; *see also Hoke Cty. Bd. of Educ. v. State,* 358 N.C. 605, 645, 599 S.E.2d 365, 395 (2004) (observing that the legislative and executive branches "have developed a shared history and expertise in the field that dwarfs that of this and any other Court"). There is no doubt that the legislative and executive branches enjoy a myriad of institutional advantages over this Court in setting education policy.

Although this Court has not hesitated to defend our citizens' right to a sound basic education, *see Leandro,* 346 N.C. at 347, 488 S.E.2d at 255; *Hoke County,* 358 N.C. at 609, 599 S.E.2d at 373, we have repeatedly emphasized the primacy of the General Assembly in enacting new policy. We have consistently refused to allow courts to intrude "into an area so clearly the province, initially at least, of the legislative and executive branches." *Leandro,* 346 N.C. at 357, 488 S.E.2d at 261. For example, we reversed a trial court when it mandated that the State begin educating four-year-olds to rectify a failure to provide a sound basic education. *See Hoke County,* 358 N.C. at 645, 599 S.E.2d at 395. We overturned the trial court's choice of a specific policy both in recognition of courts' institutional limitations and because failing to give our coordinate branches the initial chance to craft a solution would have "effectively undermine[d] the authority and autonomy of the government's other branches." *Id.* at 643, 645, 599 S.E.2d at 393, 395.

The circumstances here cry out for the legislature to speak first, before this Court or any local board of education, on the question of mandatory year-round schooling. This case concerns a policy question of great importance to our State's educational institutions and its public school students and their families. In support of its position, the local board advocates for a statutory interpretation counter to the vast weight of traditional education practice. Nothing in the current education statutes indicates, however, that the General Assembly intended to permit local school boards to mandatorily place students at year-round schools. Accordingly, this Court should uphold the trial

court's order and preserve students' legal right to attend a traditional calendar school.

I respectfully dissent.

Justices BRADY and NEWBY join in this dissenting opinion.

Justice BRADY dissenting.

The majority opinion evinces a dramatic shift from the traditional maxim that "mother knows best" to the "progressive" idea that "bureaucrat and elected official knows best." I cannot sit silently and watch as this Court removes the ultimate responsibility of education from the hands of parents to the hands of the education establishment. While I concur fully in Justice MARTIN's well-reasoned dissenting opinion, I write separately to emphasize both the importance that family plays in the education of our young citizenry and how the majority opinion fails to consider the harmful effect of its decision on the family.

Initially, I note that the majority has failed to properly construe the statutes at issue. "When the language of a statute is clear and without ambiguity, it is the duty of this Court to give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required." *Diaz v. Div. of Soc. Servs.*, 360 N.C. 384, 387, 628 S.E.2d 1, 3 (2006) (citing *Burgess v. Your House of Raleigh, Inc.*, 326 N.C. 205, 209, 388 S.E.2d 134, 136 (1990)). The majority's construction of N.C.G.S. § 115C-1, which mandates "[t]here shall be operated in every local school administrative unit a uniform school term of nine months," is strained. To interpret that statute to mean anything other than a consecutive nine month calendar is farcical. Yet, the majority allows local school boards the authority to stretch these nine months of instruction over twelve months and then strips parents of the right to choose whether their child should be subjected to this schedule in contravention of our Constitution and the intent of the General Assembly.

The absence of reason presented by this construction is easily demonstrated through hypothetical situations involving interpretations of the word "term." Members of this Court serve an eight year term. N.C. Const. art. IV, § 16. Certainly no one would interpret that provision to mean that a member of the Court may sporadically spread his or her eight year term over the course of his or her lifetime as long as the sum total of service is only eight years. Were this a mat-

WAKE CARES, INC. v. WAKE CTY. BD. OF EDUC.

[363 N.C. 165 (2009)]

ter of an employment contract in which an employee was contractually obligated to work a nine month term, this Court certainly would not interpret that contract to allow the employee to work for three months and then take a one month vacation before resuming work without being in breach of contract. However, when the question involves placing more control of traditional family matters in the hands of government officials, such a construction suddenly becomes plausible. In effect, the majority has assumed the role of the General Assembly and rewritten the statute to say whatever it wants. I refuse to join in this blatant violation of the separation of powers.

After having contorted principles of statutory construction, the majority has now taken yet another decision relating to the education of our children out of the hands of parents, placing it into the hands of the education establishment. For years, families have been able to rely upon the traditional school calendar to plan family vacations and other family-oriented activities, which are important not only to individual families, but to the health of our culture, economy, and society in general. Now, however, the distinct probability exists that multi-children families will be presented with mandatory year-round schedules that place each of their children in a different calendar track, leaving little to no time when all the children in the family unit are free from school responsibilities. Parents may have also wished to opt for a traditional school calendar in order to give their teenagers opportunities to gain valuable employment experience during the extended summer vacations found in a nine month calendar, thereby increasing their career skills and learning the personal responsibility required of adults at an early age. For some unfortunate families in Wake County, that choice is no longer an option.[5] The majority additionally fails to recognize the severe economic impact defendants' action would have on seasonal employment, especially in the service industry, where many students experience the transition from teenagers to young adults during the summer months.

Furthermore, the uneven geographical distribution of Wake County schools subject to a mandatory year-round calendar is problematic. The mandatory year-round schedule has been implemented by the board for schools located outside of the Interstate 440 Beltline.

5. The school calendar act passed in 2004 and now codified in N.C.G.S. § 115C-84.2(d) was intended to preserve the traditional lengthy summer vacation enjoyed by families across North Carolina. Incredibly, this act, sought by an organization called "Save our Summers North Carolina," provided the death knell for the traditional summer for many Wake County students because of a passing mention of year-round schools relied upon by the majority in fashioning its argument.

Many families choose to live in the suburban areas outside the Beltline for reasons including school choice, economic feasibility, and familial concerns. Yet, between forced year-round schedules and the ever-raging reassignment debate, which has been chronicled in the local media, families no longer receive what they bargained for in their choice of the neighborhood in which they raise our most valuable assets.

While constitutional issues of liberty are not before the Court, the language used by this Court and the Supreme Court of the United States in dealing with such issues demonstrates the long-standing deference our judiciary and society has given to traditional family decisions on education. The liberty "interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the Supreme Court of the United States. *Troxel v. Granville,* 530 U.S. 57, 65 (2000) (plurality). No other right has been so glowingly discussed and vigorously protected by our nation's highest court. *See, e.g., Parham v. J.R.,* 442 U.S. 584, 602 (1979) ("Our jurisprudence historically has reflected Western civilization concepts of the family as a unit with broad parental authority over minor children. Our cases have consistently followed that course . . . ."); *Quilloin v. Walcott,* 434 U.S. 246, 255 (1978) ("We have recognized on numerous occasions that the relationship between parent and child is constitutionally protected." (citations omitted)); *Wisconsin v. Yoder,* 406 U.S. 205, 232 (1972) ("The history and culture of Western civilization reflect a strong tradition of parental concern for the nurture and upbringing of their children. This primary role of the parents in the upbringing of their children is now established beyond debate as an enduring American tradition."); *Pierce v. Soc'y of Sisters,* 268 U.S. 510, 535 (1925) ("The child is not the mere creature of the State; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations.").

This Court has likewise held the right of parents to direct the upbringing of their children in high regard. *See, e.g., Owenby v. Young,* 357 N.C. 142, 145, 579 S.E.2d 264, 266 (2003) ("The protected liberty interest complements the responsibilities the parent has assumed and is based on a presumption that he or she will act in the best interest of the child." (citations omitted)); *Petersen v. Rogers,* 337 N.C. 397, 403-04, 445 S.E.2d 901, 905 (1994) (holding that "absent a finding that parents (i) are unfit or (ii) have neglected the welfare of their children, the constitutionally-protected paramount right of

parents to custody, care, and control of their children must prevail"); *Delconte v. State*, 313 N.C. 384 passim, 329 S.E.2d 636 passim (1985) (discussing home schools in relation to compulsory school attendance statutes). Yet, today the majority decision gives no deference to the traditional notion of family control of educational decisions. While it could be argued that parents have the right to remove their children from public schools and provide alternative forms of education, such an opportunity is simply not practical for many families. Considering today's decision, one cannot help but wonder about the majority's dedication to this Court's prior pronouncements on the importance of the family in educational decisions.

In the end, the majority decision is simply another chapter in the ongoing saga in which more and more traditional decisions made by the family are handed over to the government. While I certainly sympathize with the plight of the Wake County School System and the explosive population growth in the county, ease of administration should never take precedence over the preservation of the oldest institution—the family. I respectfully dissent.